# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAMARIA NELSON, as Proposed Administrator of the Estate of Shaka Nelson,** | : | **CIVIL ACTION NO. 1:23-CV-1030** |
| | : | |
| | : | **(Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF CORRECTIONS, *et al.*,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

This civil action arises out of the death of Shaka Nelson ("decedent") during his imprisonment with the Pennsylvania Department of Corrections. Decedent's sister, Kamaria Nelson, alleges that the Department and several of its employees are responsible for conditions that contributed to decedent's mental deterioration and eventual suicide while he was incarcerated at two State Correctional Institutions ("SCI"), SCI Huntingdon and SCI Phoenix. She seeks monetary damages as proposed administrator of decedent's estate under the Eighth and Fourteenth Amendments of the United States Constitution via 42 U.S.C. § 1983 and under Pennsylvania law. Defendants have moved to dismiss Nelson's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, we will grant defendants' motion in its entirety.

## I.   Factual Background & Procedural History

According to the amended complaint, decedent suffered from schizophrenia and bipolar disorder, and he was prescribed Seroquel, an antipsychotic, for the first

time at the age of 16. (See Doc. 14 ¶ 16). Decedent entered into the custody of the Pennsylvania Department of Corrections ("DOC") in June 2019 following his conviction on aggravated assault charges in March of that year. (See id. ¶ 15). Soon after arriving at SCI Phoenix, decedent informed DOC officials that he had a history of drug abuse and self-harm, including suicide attempts and hospitalizations. (See id. ¶¶ 16-17). He was diagnosed with serious psychological disorders, including "Bipolar I Disorder" and "Current or Most Recent Episode Manic with Psychotic Features." (See id. ¶ 20). Decedent advised DOC officials that he had been incarcerated before, that he had been hospitalized in the past, and that he had received treatment from DOC providers for his mental illness. (See id. ¶¶ 17-19). His medical and mental health history was well-documented. (See id. ¶ 19). At SCI Phoenix, decedent continued taking Seroquel. (See id. ¶¶ 22-23). While he was being treated with Seroquel, decedent was compliant and did not face disciplinary action from DOC officials. (See id. ¶ 23). His stability designation was a "D" on a scale of "A" to "D," meaning that he suffered from "the most severe psychological disease" and thus was the most unstable. (See id. ¶¶ 21-22¶).

Around September 2019, decedent was transferred to SCI Huntingdon, where his stability designation remained a "D." (See id. ¶¶ 24-25). DOC officials at SCI Huntingdon received records from decedent indicating that he was at high risk of suicide. (See id. ¶ 26). A few weeks later, DOC officials discontinued treating decedent with Seroquel. (See id. ¶ 27). Decedent's anxiety increased and his behavior became more erratic. (See id. ¶¶ 28-33). He filed a grievance report regarding the discontinuance of his medication, and he also reported that he was

sexually assaulted by a cellmate.  (See id. ¶¶ 28, 30).  Rather than treat decedent with medication, DOC officials placed him in restrictive housing—"the hole"—for 30 days at some point beginning in November 2019.  (See id. ¶ 32).  Nelson avers that DOC healthcare providers submitted a false report that same month downgrading decedent's stability designation from a "D" to a "C" and stating that he had not exhibited signs of "mania, anxiety, psychosis, or depression."  (See id. ¶¶ 35-36).  The November 2019 report also stated that decedent's medical diagnoses had been "completely resolved."  (See id.  ¶ 37).  In December 2019, decedent filed another grievance report reiterating that he was suicidal and that he needed Seroquel.  (See id. ¶ 38).  He was admitted for observation, did not receive medication, and was released two days later with a note stating that he should have "no psychiatric restrictions."  (Id.)

In 2020, decedent indicated that being housed with other inmates was deleterious to his mental health and that a change to his housing conditions would help alleviate some of his anxieties.  (See id. ¶ 40).  DOC officials denied his request for a single-occupant cell.  (See id.)  For various incidents of misconduct and failure to obey, decedent was sanctioned and, in June 2020, returned to the hole.  (See id. ¶¶ 39, 44).  While decedent was in the hole, DOC healthcare providers reported that his stability designation improved from "C" to "B."  (See id. ¶¶ 45-46).  This designation resulted in decedent being considered psychologically stable, and in his discharge from any psychiatric or mental health treatment.  (See id. ¶ 46).

In early September 2020, decedent again reported that he was the victim of sexual assault and that he feared for his safety; defendants purportedly "took no

action to move or protect" him.  (See id. ¶ 48).  On September 25, 2020, decedent

hanged himself from the metal on his cell window using a "rope[-]like ligature."

(See id. ¶ 49).  DOC officers found decedent but were unable to cut him down from

the window for a "substantial amount of time" because they did not have a "J-

tool"—a tool designed to cut through rope or cloth in suicide attempts—despite

being required to always carry the tool.  (See id. ¶¶ 50-51).

Nelson avers that the unit where decedent was housed at the time of his

death "had none of his mental health history, or suicide history" because he had

been discharged as a psychiatric patient and assigned a stability designation of "B."

(See id. ¶ 52).  She asserts that this omission resulted in decedent's placement in a

unit that was not proofed against suicide.  (See id. ¶ 54).  Furthermore, based upon a

DOC report, she notes that it is "unusual" for an inmate with a designated mental

health stability code of "D" to improve to a "C," let alone a "B."  (See id. ¶ 55).

Nelson also avers that defendants were aware of the risks associated with placing

individuals with mental health concerns in restrictive housing, as evidenced by a

2015 Department of Justice report and then-DOC Secretary John Wetzel's public

comments regarding the same.  (See id. ¶¶ 57-58).  Considering the foregoing,

Nelson asserts that the various defendants created conditions that led to decedent's

decline and ultimate death, including failure to train DOC staff and deliberate

withholding of mental health care.  (See id. ¶¶ 60-71).

Nelson initiated this action by filing a complaint in the United States District

Court for the Eastern District of Pennsylvania.  She named as defendants the DOC

and, in their individual capacities Wetzel, John Rivello (Superintendent of SCI

Huntingdon), Joel Kohler (Deputy Superintendent for Facilities Management of SCI Huntingdon), and Jill Spyker (Deputy Superintendent for Centralized Services of SCI Huntingdon). Nelson amended her complaint to add three unnamed supervising correction officers, ten unnamed corrections officers, and ten unnamed medical providers as defendants.

Defendants moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6); they also asserted that the Eastern District was an improper venue for Nelson's claims. The Honorable John M. Younge granted the motion to transfer Nelson's action to this court. We instructed the parties that we would decide defendants' motion on the briefs submitted to Judge Younge. The motion is fully briefed and ripe for decision.

## II.    Legal Standards

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction. See FED. R. CIV. P. 12(b)(1). Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction. Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)). In either instance, it is the plaintiff's burden to establish jurisdiction. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). Courts may grant a Rule 12(b)(1) motion

based on the legal insufficiency of a claim only when it appears with certainty that assertion of jurisdiction would be improper.  See <u>Gould Elecs. Inc. v. United States</u>, 220 F.3d 169, 178 (3d Cir. 2000).

A defendant may properly raise the jurisdictional defense of Eleventh Amendment immunity in a motion to dismiss pursuant to Rule 12(b)(1).  <u>See</u> <u>Blanciak v. Allegheny Ludlum Corp.</u>, 77 F.3d 690, 693 n.2 (3d Cir. 1996) (citing <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 98-100 (1984)); <u>see also</u> <u>Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.</u>, 730 F.3d 291, 318 (3d Cir. 2013) (citing <u>Blanciak</u>, 77 F.3d at 693 n.2).  The court may consider Eleventh Amendment issues *sua sponte*, but is not required to do so.  <u>Bowers v. Nat'l Coll. Athletic Ass'n</u>, 346 F.3d 402, 417 (3d Cir. 2003) (citation omitted); <u>see also</u> <u>Wis. Dep't of Corr. v. Schacht</u>, 524 U.S. 381, 394 (1998).

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. <u>See</u> F<small>ED</small>. R. C<small>IV</small>. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents."

Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar.

Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the

defendant fair notice of what the . . . claim is and the grounds upon which it rests."

Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

**III.   Discussion**

Defendants raise numerous challenges to Nelson's amended complaint,

including lack of subject matter jurisdiction, various claims of immunity, and failure

to plead facts sufficient to show a plausible claim for relief.  As a matter of law, we

find that Nelson's claims against the Department and her state law claims are

barred by immunity defenses.  Next, we examine the remaining federal claims under Section 1983 and find that the amended complaint fails to state a claim against Wetzel, Rivello, Kohler, or Spyker upon which relief may be granted.  We will address defendants' arguments *seriatim*.

### A.      Claims Against the Department

The Department asserts that it is entitled to Eleventh Amendment immunity against all of Nelson's claims.  (See Doc. 17 at 6-7).  The Eleventh Amendment provides that, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  Our court of appeals considers it "well-settled as a matter of judicial construction that despite its limited and seemingly unambiguous language, the Eleventh Amendment constitutionalizes a much more far-reaching principle of state sovereign immunity."  Everett v. Schramm, 772 F.2d 1114, 1118 (3d Cir. 1985) (citations omitted).  The Supreme Court has interpreted the Eleventh Amendment as extending to suits brought against a state by its own citizens without the state's consent as well as to suits brought against a state agency or department. See id. (citing Fla. Dep't of Health and Rehabilitative Servs. v. Fla. Nursing Home Assoc., 450 U.S. 147 (1981)); see also Hans v. Louisiana, 134 U.S. 1 (1890).

There are three basic exceptions to Eleventh Amendment immunity: (1)  Congress may specifically abrogate a state's sovereign immunity by exercising its enforcement power under the Fourteenth Amendment; (2) a state may waive its sovereign immunity by consenting to suit; or (3) under *Ex parte* Young, 209 U.S. 123

(1908), a state official may be sued in their official capacity for prospective injunctive relief.  See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999); Koslow v. Pennsylvania, 302 F.3d 161, 168 (3d Cir. 2002).  It is well-settled, however, that Congress did not intend to abrogate state sovereign immunity by enacting Section 1983.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 66-71 (1989).  Moreover, the Commonwealth has unequivocally withheld its consent to such suits.  See 42 PA. STAT. AND CONS. STAT. ANN. § 8521(b); Lombardo v. Pa. Dep't of Pub. Welfare, 540 F.3d 190, 196 n.3 (3d Cir. 2008).  Because Nelson does not seek prospective injunctive relief, none of the exceptions to Eleventh Amendment immunity apply.  We accordingly agree with the Department and will grant its motion to dismiss all claims for want of jurisdiction.

### B.    State Law Claims

Nelson's amended complaint contains two state-law causes of action. Specifically, Counts V and VI assert that she is eligible to recover damages under Pennsylvania's Wrongful Death and Survival Acts, respectively.  (See Doc. 14 ¶¶ 85-93 (citing 42 PA. STAT. AND CONS. STAT. ANN. §§ 8301, 8302; 20 PA. STAT. AND CONS. STAT. ANN. § 3373)).  Nelson is mistaken.

As a preliminary matter, neither the Wrongful Death Act nor the Survival Act creates an independent cause of action; rather, claims under each statute derive from the injury to the decedent.  See 42 PA. STAT. AND CONS. STAT. ANN. §§ 8301, 8302; see also Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 660 (Pa. Super. Ct. 2013) (quoting Kaczorowski v. Kalkosinski, 184 A. 663, 664 (Pa. 1936)).  This court has explained that "where no underlying tort has been pled, there can be no

wrongful-death or survival action." McCracken v. Fulton County, No. 3:19-CV-1063, 2020 WL 2767577, at *10 (M.D. Pa. May 28, 2020) (Conner, C.J.) (citing, *inter alia*, Kaczorowski, 184 A. at 664).  Nelson's amended complaint does not allege that decedent suffered a standalone tort.  It does, however, assert that defendants acted negligently, ostensibly allowing for recovery under these Pennsylvania laws.  (See Doc. 14 ¶ 88) ("Defendants . . . acted with . . . negligence").

Even assuming, *arguendo*, that Nelson has sufficiently pled an underlying tort, these claims fail because the DOC is a Commonwealth agency.  Accordingly, the DOC and its employees are entitled to sovereign immunity from state-law claims, including allegations of liability arising from negligent acts.  See McGrath v. Johnson, 67 F. Supp. 2d 499, 511 (E.D. Pa. 1999) (state agencies and their employees are entitled to protections afforded by sovereign immunity) (citing Maute v. Frank, 657 A.2d 985, 986 (Pa. Super. Ct. 1995); Robles v. Pa. Dep't of Corr., 718 A.2d 882, 884 (Pa. Commw. Ct. 1998)), aff'd 35 F. App'x 357 (3d Cir. 2002) (nonprecedential).[1][2]  Allegations of willful misconduct similarly do not negate the

---

[1] The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  Citations to nonprecedential decisions reflect that the court has carefully considered and is persuaded by the panel's *ratio decidendi*.

[2] See also Edwards v. Rivello, No. 1:23-CV-156, 2023 WL 8437052, at *3 (M.D. Pa. Dec. 5, 2023) (Conner, J.) (subject to enumerated statutory exceptions, sovereign immunity includes immunity from liability for negligence) (citing McGrath, 67 F. Supp. 2d at 511).  The Commonwealth of Pennsylvania has explicitly retained its sovereign immunity and not waived it, except in ten carefully defined and limited circumstances: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highway and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.  42 PA. STAT. AND CONS. STAT. ANN. § 8522(b).

applicability of sovereign immunity when officials are acting within the scope of their duties.  See Bletz v. Corrie, No. 1:16-CV-717, 2019 WL 1354005, at *9 n.12 (M.D. Pa. Mar. 26, 2019) (citing Brautigam v. Fraley, 684 F. Supp. 2d 589, 594 (M.D. Pa. 2010)); La Frankie v. Miklich, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992) (*en banc*).[3] Unlike Eleventh Amendment immunity, this protection "applies to Commonwealth employees in both their official and individual capacities."  Larsen v. State Emps.' Ret. Sys., 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008) (citing Maute, 657 A.2d at 986). The court therefore finds that Nelson's arguments under Pennsylvania's Wrongful Death and Survival Acts are not claims upon which relief may be granted.  See FED. R. CIV. P. 12(b)(6).  We will dismiss Counts V and VI of the amended complaint.

### C.    Section 1983 Claims

Nelson brings her remaining claims under 42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights but

---

While Nelson alleges that decedent was a victim of sexual assault, (see Doc. 14 ¶¶ 30, 48), the "sexual abuse" exception exists only for "[c]onduct which constitutes an offense enumerated under section 5551(7)," see 42 PA. STAT. AND CONS. STAT. ANN. § 8522(b)(10).  Section 5551(7), in turn, is limited to offenses in which "the victim was under 18 years of age at the time of the offense."  See 42 PA. STAT. AND CONS. STAT. ANN. § 5551(7); see also Jean v. City of Philadelphia, 604 F. Supp. 3d 271, 276 n.3 (E.D. Pa. 2022) ("[I]n enacting the sexual abuse exception, the Pennsylvania legislature made clear that its intended purpose is to 'waive sovereign immunity for public entities guilty of covering up childhood sexual abuse.'") (emphasis in Jean) (citation omitted).  Nelson does not assert that decedent was under 18 years of age at the time of the alleged offenses.

[3] While Nelson alleges willful misconduct with respect to her claim under Pennsylvania's Wrongful Death Act, (see Doc. 14 ¶ 88), she does not allege that any of the defendants acted outside the scope of their duties.

serves as a mechanism for vindicating rights otherwise protected by federal law.
See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d
1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, a plaintiff must show a
deprivation of a "right secured by the Constitution and the laws of the United
States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204
(quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  Nelson
alleges that defendants violated decedent's right to be free from cruel and unusual
punishment under the Eighth and Fourteenth Amendments to the United States
Constitution while he was imprisoned at SCI Huntingdon, and she seeks monetary
damages pursuant to Section 1983.  (See Doc. 14 ¶ 1).  Defendants assert that Nelson
has failed to state a claim upon which relief may be granted as to both Wetzel and
Rivello's supervisory liability and her "failure to train" allegation in light of case law
interpreting those doctrines.  (See Doc. 17 at 7-10).  We agree.

### 1. *Supervisory Liability*

Wetzel and Rivello argue that Nelson fails to allege a plausible claim for
supervisory liability under Section 1983 because she does not assert either
defendant's "personal involvement" in actions leading to decedent's suicide.  (See
id. at 7-9).  Defendants further contend Nelson named them simply because of their
titles, and not due to their conduct, thereby violating Rule 8.  (See Doc. 17 at 7-9
(citing Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003) (*per curiam*) (quoting
Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)); Iqbal, 556 U.S. at 676-77));
see also FED. R. CIV. P. 8(a)(2) (requiring that a pleading contain "a short and plain

statement of the claim showing that the pleader is entitled to relief"). Upon review of relevant precedent, we agree.

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishment" upon its citizens. U.S. CONST. amend. VIII. Encompassed within that prohibition is the requirement that prison officials provide "humane conditions of confinement" to incarcerated individuals. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). Prison officials may not "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Atkinson v. Taylor, 316 F.3d 257, 272 (3d Cir. 2003). A successful conditions-of-confinement claim must satisfy a two-pronged test with objective and subjective components: *first*, that the plaintiff experienced an objectively "serious" deprivation of life's basic needs or that they were exposed to a "substantial risk of serious harm" to their health; and, *second*, that the defendants knew of and were deliberately indifferent to that deprivation or risk. See Farmer, 511 U.S. at 834; Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 227-28 (3d Cir. 2015). Defendants focus on the second prong.

Relevant to the form of Nelson's amended complaint, a civil rights action against an individual government defendant requires a showing that the defendant had "personal involvement" in the violation of a plaintiff's rights, and it cannot be predicated upon *respondeat superior*. See Rode, 845 F.2d at 1207; Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). Personal involvement includes directing others to violate a plaintiff's rights, or having actual knowledge of and acquiescing in the alleged violations. See Evancho, 423 F.3d at 353; A.M. *ex rel.* J.M.K.

v. Luzerne Cnty. Juvenile Detention Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citing

Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995)).  Supervisors can

be held liable if they "established and maintained a policy, practice or custom

which directly caused [the] constitutional harm."  See Santiago v. Warminster

Township, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (quoting A.M., 372 F.3d at 586).  But a

mere hypothesis that an individual defendant had personal knowledge of or

involvement in the deprivation of a plaintiff's rights is insufficient to establish

personal involvement.  See Rode, 845 F.2d at 1208; see also Payne v. Butts, No. 21-

2210, 2022 WL 16916347, at *1 (3d Cir. Nov. 14, 2022) (per curiam) (nonprecedential)

("A mere hypothesis about a defendant's knowledge will not suffice.").  Our court of

appeals has further instructed that the review and denial of a prisoner's grievance

alone does not establish personal involvement in an underlying violation of the

prisoner's constitutional rights.  See Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir.

2020); see also Robinson v. Delbalso, No. 22-2378, 2022 WL 17248100, at *2 (3d Cir.

Nov. 28, 2022) (per curiam) (nonprecedential).

Facially, the amended complaint does not articulate a plausible claim for

relief under a theory of personal involvement.  Nelson's allegations do not include

facts specific to Wetzel or Rivello, and those claims that are phrased without

particularity cannot survive defendants' motion.  (See, e.g., Doc. 14 ¶ 59

("Defendants failed to provide medically necessary mental health treatment and

failed to take reasonable measures to prevent [decedent] from engaging in self-

harm or suicide.")); Evancho, 423 F.3d at 354.  Nelson does not assert that Wetzel or

Rivello directed others to violate decedent's rights, and to the extent the amended

complaint alleges knowing acquiescence to misconduct, she fails to provide a factual basis for that inference. (See Doc. 14 ¶ 80 (asserting that defendants "acquiesced in policies and practices that withheld necessary treatment, which was known to Defendants")).[4] Finally, we set aside any allegations premised upon whatever role Wetzel or Rivello may have played in denying decedent's formal grievances. See Dooley 957 F.3d at 374.

What remains of Nelson's amended complaint is similarly deficient. She asserts that Wetzel and Rivello "maintain rules that an inmate['s] psychological history is not provided to the unit [where the inmate is housed] if the inmate is deemed as currently mentally stable." (See Doc. 14 ¶ 53). More broadly, she asserts that various policies and practices existed "which were causing"—or risking— serious harm to inmates with mental illness or vulnerability to suicide. (See, e.g., id. ¶ 66). But courts afford prison medical authorities "[d]eference . . . in the diagnoses and treatment of patients," and "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment." Palakovic v. Wetzel, 854 F.3d 209, 227-28 (3d Cir. 2017) (quoting Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)); see id. ("Allegations of mere negligent treatment or even medical malpractice do not trigger the protections of the Eighth Amendment."). To

---

[4] Nelson asserts that "Defendants were well aware, based on a 2015 U.S. Department of Justice investigation, that the use of restrictive housing as punishment for inmates with mental illness was bad practice and led to increased incidents of suicide." (See Doc. 14 ¶ 57). Apart from involving only a narrow subset of Nelson's claims, this assertion is devoid of factual support and does not indicate actual knowledge of specific conduct. Cf. Dooley, 957 F.3d at 374 (inmate sending copies of grievances to DOC Secretary insufficient to establish actual knowledge).

the extent the amended complaint invites the court to examine the correctness of decedent's treatment or stability designation, we decline that invitation.

While Nelson clearly alleges that decedent informed DOC officials of his history with mental illness and suicidality, (see Doc. 14 ¶¶ 26, 28), she also acknowledges that he received some degree of professional attention, (see id. ¶ 20 (DOC officials diagnose decedent); ¶ 27 (medical providers discontinue Seroquel)). Indeed, many of the allegations of deficient care stem from decedent's stability designation improving from a "D" to a "B."  (See id. ¶¶ 35, 46).[5]  Cognizant of the difficulty associated with establishing deliberate indifference where a prisoner "has received some amount of medical treatment," and the "considerable latitude" afforded to prison officials in diagnosis and treatment, see Palakovic, 854 F.3d at 227, we will grant defendants' motion and dismiss Counts I, II, and III as they pertain to Wetzel and Rivello.[6]

## 2. *Failure to Train*

Nelson contends that defendants "failed to train [DOC] staff at SCI Huntingdon on how to manage prisoners with serious mental illness and those that

---

[5] For instance, failing to house an inmate in a cell that has not been "proofed or protected against suicide," and maintaining rules in which an inmate's history of mental illness "is not provided to the unit if the inmate is deemed as currently mentally stable," (see Doc. 14 ¶¶ 53, 54), are not inherently problematic.  The court understands the argument that these actions resulted in a constitutional violation to follow from Nelson's belief that decedent should not have been deemed stable in the first place.

[6] The amended complaint asserts Counts I, II, and III against all defendants, (see Doc. 14 ¶¶ 73, 75-78, 80-81), but defendants move to dismiss Nelson's deliberate indifference claims against Wetzel and Rivello only, (see Doc. 17 (proposed order)). Accordingly, Counts I, II, and III are not dismissed as to Spyker and Kohler.

were vulnerable to suicide." (See Doc. 14 ¶ 83). Count IV of the amended complaint specifically alleges that DOC personnel were not carrying the "J-tool" upon finding decedent. (See id. ¶¶ 50-51, 83). Defendants characterize Count IV as a failed attempt at stating a <u>Monell</u> claim,[7] which they argue is not viable against state as opposed to municipal officials; they also contend that Nelson presents her claim in conclusory terms. (See Doc. 17 at 9-10). We agree that Nelson's claim fails as a matter of law. Although municipal officials may be subject to <u>Monell</u> liability in the "failure to train" context, the same is not true for state officials. See <u>Will</u>, 491 U.S. at 71; <u>see also</u> <u>O'Hara v. Indiana Univ. of Pa.</u>, 171 F. Supp. 2d 490, 499 (W.D. Pa. 2001). Wetzel, Rivello, Kohler, and Spyker are employees of the Commonwealth, therefore we will dismiss Count IV as to each of them.

### D. Leave to Amend

Courts must generally grant leave to amend before dismissing a civil rights action if curative amendment is conceivable. See <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002). Because Nelson plausibly could cure the defects relative to her claims of deliberate indifference and vulnerability to suicide by presenting new factual allegations, we will dismiss Counts I, II, and III against Wetzel and Rivello without prejudice. Conversely, Nelson's "failure to train" theory and state causes of action fail for the legal reasons identified above such that further

---

[7] In <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658 (1978), the Supreme Court established that a municipality may be held liable under Section 1983 if a plaintiff can prove that an action pursuant to an official municipal policy caused their constitutional injury. See <u>Monell</u>, 436 U.S. at 691, 694.

amendment would be futile, thus we will dismiss Counts IV, V, and VI with prejudice.

**IV.**   **<u>Conclusion</u>**

We will grant defendants' motion to dismiss as explained hereinabove.  An appropriate order shall issue.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    January 26, 2024