## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAMARIA NELSON, as Administrator of the Estate of Shaka Nelson, | CIVIL ACTION NO. 1:23-CV-1030 |
| Plaintiff, | (SAPORITO, J.) |
| v. | |
| JOHN WETZEL, et al., | |
| Defendants. | |

## <u>MEMORANDUM</u>

The civil action before the Court stems from the death of Shaka Nelson (the "decedent") during his imprisonment with the Pennsylvania Department of Corrections. The decedent's sister, Kamaria Nelson (the "plaintiff"), has alleged that the Department and several of its employees are responsible for the conditions that contributed to the decedent's mental deterioration, and eventual suicide, during his incarceration at the State Correctional Institutions, SCI Huntingdon and SCI Phoenix. The plaintiff brings the following claims against all defendants: (1) deliberate indifference to the deprivation of decedent's basic human needs; (2) deliberate indifference to decedent's serious medical needs; and (3) vulnerability to suicide claim in violation of the Eighth Amendment.

She seeks monetary damages as the administrator of the decedent's estate under the Eighth and Fourteenth Amendments of the United States Constitution via 42 U.S.C. § 1983 and Pennsylvania law. Three defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure: (1) John Wetzel, the Secretary of the Pennsylvania Department of Corrections ("PDOC"); (2) Joel Kohler, the Deputy Superintendent for Facilities Management at SCI Huntingdon; and (3) Jill Spyker, the Deputy Superintendent for Centralized Services at SCI Huntingdon. The parties have briefed the motion (Doc. 63; Doc. 64; Doc. 65; Doc. 66; Doc. 71) and it is now ripe for review.

## I.    Background

The facts offered by the defendants in consideration of their motion for summary judgment are limited (Doc. 63), and the facts contested by the plaintiff are far fewer. (Doc. 66). The parties agree that the decedent, Shaka Nelson, was incarcerated at the State Correctional Institution at Huntingdon from September 10, 2019, to September 25, 2020. (Doc. 63, ¶ 13). Moreover, the parties do not dispute that on September 25, 2020, the decedent was found hanging in the back of his cell and was later pronounced dead. (*Id.*, ¶¶ 14, 21). However, the parties have failed to

provide the necessary information within these documents for the Court to make a comprehensive assessment of the record. We have therefore added the relevant information as pertinent to this action below.[1]

## A.    The Decedent's Mental Health Treatment

Before the decedent's incarceration at SCI Huntington, the decedent was previously incarcerated at the State Correctional Institution at Phoenix ("SCI Phoenix"). An initial assessment at SCI Phoenix revealed that the decedent had been previously diagnosed with bipolar disorder and had used the medication Seroquel for several years for anxiety and depression. Moreover, the decedent reported that he had been hospitalized on at least one occasion for two suicide attempts. As a result, the decedent was continued on his Seroquel treatment and placed on the mental health roster as a C stability code at SCI Phoenix.

The decedent was then transferred to SCI Huntingdon on

---

[1] Upon consideration of the record, the internal report compiled by the Bureau of Investigations and Intelligence in response to the decedent's death at the State Correctional Institution at Huntingdon reflects the most comprehensive compilation of facts at issue in this action. (Doc. 72). Therefore, we will rely on this document to fill in all factual gaps in the record that are unaddressed by both parties in this action. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

September 9, 2019. The staff at SCI Huntingdon placed the decedent on the mental health roster as a D stability code[2] and diagnosed the decedent with the following diagnoses: (1) bipolar 1 disorder, current or most recent episode manic, with psychotic features; (2) antisocial personality disorder; and (3) alcohol use disorder, severe. While classification records noted a history of mental health treatment, the decedent refused to provide additional details or information regarding his previous mental health experiences, and further denied staff access to community records to substantiate his report of mental health treatment.

On or around September 11, 2019, the decedent was informed by a regional psychiatrist that he would begin to be tapered off from the use of Seroquel in the next thirty days due to the decedent's prior admission of abuse of the medication. The decedent subsequently refused to take doses of Seroquel for the next eighteen days, and October 4, 2019, the drug was discontinued by the psychiatry.

---

[2] A "D stability code" refers to an individual that is currently diagnosed with a serious mental illness, intellectual disability, credible functional impairment, or found guilty but mentally ill. DC-ADM 13.8.1, Access to Mental Health Care Manual, at § 2(A)(1)(c)(4).

On November 26, 2019, the decedent was downgraded to a C stability code.[3] The decedent, according to the records, had not shown any signs of mania, anxiety, psychosis, or depression since his arrival at SCI Huntingdon. Upon learning of his new stability code, the decedent stated he was suicidal due to that change. The decedent was then placed in a psychiatric observation where he was seen by psychiatry and psychology staff. The decedent was discharged the following day after showing no further signs of suicidal intentions. On June 23, 2020, the decedent was reviewed by the Psychiatric Review Team and downgraded to a B stability code,[4] thus removing him from the mental health roster. The team noted that the decedent had reported no mental health symptoms, even in the absence of psychotropic medications, and the decedent was

---

[3] A "C stability code" refers to an individual that is currently receiving psychological treatment, but may or may not be receiving psychiatric (psychotropic medications) treatment, and is not currently diagnosed with a serious mental illness or functional impairment and does not have an intellectual disability or is not guilty but mentally ill. DC-ADM 13.8.1, Access to Mental Health Care Manual, at § 2(A)(1)(c)(3).

[4] A "B stability code" refers to an individual that has an identified history of psychiatric treatment (other than a serious mental illness or intellectual disability history), but no current need for psychiatric treatment and does not require follow-up/support from Psychology on a regular basis. DC-ADM 13.8.1, Access to Mental Health Care Manual, at § 2(A)(1)(c)(2).

neither benefiting from nor participating in therapeutic opportunities.[5]

On September 25, 2020, the decedent was found hanging from a bed sheet

in his rear window and later pronounced dead.

The internal report states the following conclusions:

> [The decedent] was offered mental health services consistent with Department of Corrections policy for the entirety of his time on the mental health roster… Mental health contacts were conducted more than required by policy (19 contacts from September – December, 2019 and 21 from January – September, 2020) and additionally per his requests. Psychology Department staff continued to maintain mental health contacts consistent with his self-identified needs and policy once he was removed from the mental health roster on June 23, 2020 due to a lack of mental health symptoms and his refusal to participate in psychiatric and psychological services. There were a total of 40 mental health contacts made until the time of death of which … he was removed from the Mental Health Roster.

> The record reflects that whenever treatment staff would routinely and directly ask [the decedent] about thoughts of depression, anxiety, suicidal ideation, self harm, or homicidal ideation; [the decedent] consistently denied such except when in furtherance of a Z code for housing purposes. Further, at each mental health contact, he was reminded as to how to request contact with psychological and/or psychiatric services. Last, a complete review of ICAR and Sapphire documentation

---

[5] The internal report states that the decedent had refused any psychotropic medications after being taken off Seroquel and had been medication free for approximately eleven months at the time of his death.

indicates that [the decedent] did not report any sudden change in mental health status, nor any overt indications of distress sufficient to warrant increased monitoring of suicide.

## B.    Misconduct and Housing Assignments

During the decedent's incarceration, he was issued numerous misconducts affecting his housing assignments. On June 10, 2019, the decedent was issued a misconduct for using abusive, obscene, or inappropriate language to staff when he refused to be tested for tuberculosis per Department of Corrections policy. The decedent was placed on the Restricted Housing Unit (RHU) for fifteen days. On June 24, 2019, he was released to the general population by the Program Review Committee. On June 29, 2020, the decedent was placed back on the RHU for misconduct, where he stayed until he was returned to the general population on July 1, 2020.

On July 6, 2020, the decedent was issued a misconduct for using abusive, obscene, or inappropriate language to an employee and was sanctioned to 30 days of disciplinary confinement for the misconduct and placed in the RHU. On July 29, 2020, he was sanctioned to an additional thirty days of disciplinary confinement for refusing to obey an order to return to the general population. On August 26, 2020, the Program

Review Committee released the decedent back to the general population, but the decedent again refused to obey the order. For that reason, the decedent was sanctioned to another thirty days of disciplinary confinement for the misconduct. On September 24, 2020, the decedent expressed his desire to be released back to the general population and staff was notified to interview the decedent for a possible return to the general population. The decedent was found hanging from a bed sheet in his rear window the following day and later pronounced dead.

## II.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the

movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluation a motion for summary judgment, the Court must first determine if the moving party has made a prima facie showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III.  Discussion[6]

---

[6] We must briefly address an argument that the defendants made in their motion for summary judgment regarding standing. The defendants argue that the plaintiff lacked standing to bring this action in her individual capacity due to her failure to obtain any letters of administration deeming her qualified to represent the interests of the decedent's estate. However, the plaintiff has since informed that court that she has obtained the necessary letters of administration, and we have held that the letters of administration are now part of the record. (Doc. 73; Doc. 76). Therefore, upon review of the updated record, the defendants' argument concerning the plaintiff's standing is rendered moot.

The plaintiff brings three constitutional claims under 42 U.S.C. § 1983 against defendants Wetzel, Spyker, and Kohler under the theory of supervisory liability for policies and practices that the plaintiff claims contributed to the alleged constitutional harms in this action: (1) deliberate indifference to the deprivation of the decedent's basic human needs; (2) deliberate indifference to the decedent's serious medical needs; and (3) vulnerability to suicide claim in violation of the Eighth Amendment. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.

1995). To avoid dismissal, a civil rights complaint must state the conduct, time, place, and persons responsible for the alleged civil rights violations. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

Under 42 U.S.C. § 1983, "there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiffs rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Small v. Kauffman*, No. 1:20-CV-1242, 2021 WL 5759033, at *5 (M.D. Pa. Dec. 3, 2021) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)) (quotation and alteration marks omitted). The plaintiff attempts to hold defendant Wetzel liable under the first theory of supervisory liability, arguing that defendant Wetzel was "responsible for authorizing and implementing policies and practices that were deliberately indifferent to prisoners who were in serious need of mental health care" and "prisoners who were vulnerable to suicide." (Doc. 48, ¶¶ 91, 94). The plaintiff attempts to hold defendants Spyker and Kohler liable under the second theory of supervisory liability,

contending that they were "aware of the policies and practices causing harm to those with serious mental illness" and those with a "vulnerab[ility] to suicide[,]" but "failed to take any measures to alter these policies and practices." (*Id.*, ¶¶ 92, 95).

## A.    The Alleged Policy Deficiencies

Upon review of the plaintiff's complaint, many of the allegations against the defendants concern the correctness and adequacy of the decedent's treatment and stability designation, rather than the lack of mental health treatment. *See* (Doc. 48, ¶¶ 90, 91, 94, 95) (listing policy issues such as "severely limiting or refusing to provide drug and alcohol counseling, psychological counseling," "inadequate monitoring of the effectiveness of medications," and "use of medication as a substitute for more effective treatments."). At the time of the decedent's incarceration at SCI Huntington, defendant Wetzel was the Secretary of Corrections. (Doc. 63, ¶ 35). His job duties included working with the governor's office to determine policy and acting as a liaison on criminal justice policy, community, and education. (*Id.*, at ¶ 35(a)). Defendant Kohler was the Deputy Superintendent for Facilities Management at SCI Huntingdon, and his duties consisted of managing the operations of security,

maintenance, and the facility. (Doc. 63, ¶¶ 37, 37(a)). Defendant Spyker

was the Deputy Superintendent for Centralized Services, and her duties

entailed overseeing the operations of the kitchen, education, medical, and

correctional industries departments. (*Id.*, ¶¶ 39, 39(a)). Therefore, the

defendants in this action are all non-medical officials.

For Eighth Amendment claims, non-medical prisoner officials

typically cannot be found deliberately indifferent if they fail to respond

to the medical needs of an inmate already being treated by prison medical

authorities, or if, as non-physicians, they defer to the medical judgment

of the inmate's treating medical staff. *Durmer v. O'Carroll*, 991 F.2d 64,

69 (3d Cir. 1993). The Third Circuit has held:

> Where a prisoner has received some amount of medical
> treatment, it is difficult to establish deliberate
> indifference, because prison officials are afforded
> considerable latitude in the diagnosis and treatment of
> prisoners. *See Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d
> Cir. 1993). Allegations of mere negligent treatment or
> even medical malpractice do not trigger the protections
> of the Eighth Amendment. *Estelle*, 429 U.S. at 105–06,
> 97 S.Ct. 285. "Where a prisoner has received some
> medical attention and the dispute is over the adequacy
> of the treatment, federal courts are generally reluctant
> to second guess medical judgments and to
> constitutionalize claims which sound in state tort law."
> *United States ex. Rel. Walker v. Fayette County*, 599
> F.2d 575, 575 n.2 (3d Cir. 1979) (internal quotations and
> citation omitted). Deference is given to prison medical

> authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment … [which] remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original).

*Palakovic v. Wetzel*, 854 F.3d 209, 227–28 (3d Cir. 2017). Here, the record shows that SCI Huntingdon had policies and practices in place for prisoners with mental illnesses, and the plaintiff does not dispute that the decedent received medical treatment for his condition. *See generally* (Doc. 72) (finding that the decedent was put on a treatment plan including the discontinuance of the use of Seroquel and was offered mental health services consistent with the Department of Corrections policy for the entirety of his time on the mental health roster). But the Third Circuit has held that "there are some circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic,* 854 F.3d at 228 (citing *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) and *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)). Prisoners that are subjected to the repeated confines of solitary confinement with a serious mental health illness and a vulnerability to suicide serve as one of those

circumstances, *id.* at 229, and here, the plaintiff makes that same claim. The plaintiff alleges that SCI Huntingdon had a policy of subjecting "prisoners like [the decedent] with serious mental illness … to prolonged periods of solitary confinement under conditions that exacerbate their mental illness, leading to severe psychological and physiological harms." (Doc. 65, at 9). *See* (Doc. 65, at 5, 6) (listing the policies directly precipitating the constitutional violations as: (1) prolonged and unjustifiable use of solitary confinement; (2) systemic deficiencies in mental health care leading to an overreliance on solitary confinement; and (3) discriminatory practices of placing prisoners with mental illness in solitary confinement). Although the defendants have correctly noted that the decedent received some medical treatment and the sufficiency of that treatment requires deference to medical officials, the plaintiff's allegation that the decedent was placed in solitary confinement falls outside the scope of that deference, and thus, summary judgment cannot be granted on that ground. *See Palakovic,* 854 F.3d at 228. The plaintiff's allegation that SCI Huntington placed prisoners with mental health illnesses and a vulnerability to suicide in extended solitary confinement provides a sufficient basis for the plaintiff's Eighth Amendment claims

and requires further analysis in this action.[7]

## B.    Plaintiff's Eighth Amendment Constitutional Claims

All three of the plaintiff's claims are brought under the Eighth Amendment. The Eighth Amendment to the United States Constitution protects prisoners from cruel and unusual punishment including "the unnecessary and wanton infliction of pain." *Hudson v. McMillan*, 503 1, 5 (1992). To prevail on an Eighth Amendment claim, an inmate must show two elements: (1) a deprivation that is objectively, sufficiently

---

[7] The plaintiff also identifies other allegedly deficient policies for the basis of her claims, none of which are substantiated. The plaintiff's complaint lists a "failure to ensure staffing levels that were medically necessary to ensure that mental health staff could meet the needs of prisoners with serious mental illness and those who were vulnerable to suicide" and a "failure to comply with the [Department of Justice] decree" as policies and practices that contributed to the alleged constitutional violations. (Doc. 48, ¶¶ 91, 92, 94, 95). However, there is no evidence in the record about staffing levels at SCI Huntingdon generally and the plaintiff has failed to indicate how the alleged deficiency contributed to the alleged constitutional violations. Moreover, the plaintiff has failed to expand upon the defendants' alleged failure to comply with the DOJ's decree beyond placing prisoners with serious mental illnesses in solitary confinement. Finally, we note that the plaintiff argues that prison officials failed to carry a J-tool, an item used to cut inmates down from rope or cloth in suicide attempts, during the night of the decedent's death. But the plaintiff does not dispute that the prison implemented policy concerning the availability and necessity of the J-tool, (Doc. 63, ¶ 36(a)(ii), and it is unclear what involvement, if any, that defendants Wetzel, Kohler, and Spyker had in that matter.

serious; and (2) "a sufficiently culpable state of mind" of the defendant official. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). While there are different standards for Eighth Amendment violations depending on the type of claim, under the second prong in this action, an Eighth Amendment challenge to prison conditions is subject to the deliberate indifference standard. *See id.* at 835–36.

## I.    Objective Prong

The plaintiff must first show a deprivation that is objectively and sufficiently serious. As noted above, the plaintiff argues that SCI Huntington's placement of the decedent in solitary confinement for a prolonged period of time constitutes a sufficient deprivation for Eighth Amendment purposes. Therefore, under the objective prong in this action, the plaintiff must show two elements: (1) placing individuals with mental illnesses and a vulnerability to suicide in solitary confinement amounts to a sufficient deprivation for Eighth Amendment violations; and (2) the decedent fit that classification.[8] We turn to the first element.

---

[8] The plaintiff brings two different deliberate indifference claims in this action. *See* (Doc. 48, at 17, 18) ("Count I – Deliberate Indifference to the Deprivation of Mr. Nelson's Basic Human Needs" and "Count II – Deliberate Indifference to Mr. Nelson's Serious Medical Needs.").

*(continued on next page)*

The Third Circuit has acknowledged "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement." *Palakovic*, 854 F.3d at 225. It has noted "a growing consensus—with roots going back a century—that conditions like those … can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity." *Id.* (citing *Williams v. Secretary of the Pennsylvania Department of Corrections*, 848 F.3d 549, 566–67 (3d Cir. 2017)). Moreover, "[p]hysical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subject to solitary confinement." (*Id.*, at 226) (citing *Williams*, 848 F.3d at 567–68). But "it is undisputed that a prisoner's placement in solitary confinement does not, in itself violate the Constitution" as isolation "may be a necessary tool of prison discipline." *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777, 780 (M.D. Pa. 2016) (citing *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992), *superseded on other*

However, the plaintiff's claims under each count are indistinguishable and therefore will be scrutinized under the same analysis.

*grounds by statute*, Prison Litigation Reform Act, 42 U.S.C. § 1997, et seq.). "In assessing whether solitary confinement violates the Eighth Amendment, courts must look to the 'duration and conditions of segregated confinement' and the 'touchstone is the health of the inmate.'" *Stanford v. Walton*, No. CV 16-1584, 2019 WL 5068666, at *13 (W.D. Pa. Oct. 9, 2019) (citing *Young*, 960 F.2d at 364). In the context of prisoners with mental illnesses, the Third Circuit has held that "'officials' deliberate indifference towards placing inmates with known mental illnesses in conditions of extreme isolation for extended periods of time" constitutes sufficient deprivation. *Clark v. Coupe*, 55 F.4th 167, 180 (3d Cir. 2022). Therefore, in light of this background, the plaintiff must show that the decedent fits the classification of persons that courts have found have been sufficiently deprived for Eighth Amendment purposes; the decedent must have had a serious mental illness and a vulnerability to suicide, and have been placed in solitary confinement for an extended period of time.

To start, there remains at the very least a genuine dispute of material fact about whether the defendant had a serious mental illness that precludes summary judgment. It is undisputed that the decedent

was diagnosed with bipolar I disorder, current or most recent episode manic with psychotic features. *See* (Doc. 72, at 76). Not only was this diagnosis enough for the decedent to be placed on the mental health roster with a "D stability code[9]," but the Department of Corrections also explicitly lists bipolar I disorder, current or most recent episode manic with psychotic features under their definitions of "serious mental illness." *See* DC-ADM 13.8.1, Access to Mental Health Care Manual, at § 2(B)(1)(h). While the record shows that the decedent was designated with a "B stability code[10]" at the time of his placement in solitary confinement, there is no evidence in the record to suggest that the decedent's "B stability code" designation somehow nullifies his serious mental illness diagnosis.

Moreover, there remains a genuine dispute of material fact about whether the defendant had a vulnerability to suicide that precludes summary judgment. A plaintiff must establish that "the inmate had a "particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that suicide would be

---

[9] *See* footnote 2.
[10] *See* footnote 4.

attempted." *Palakovic*, 854 F.3d at 223–24. Courts have found that prison officials know of a particular vulnerability to suicide where "they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Id.* at 222 (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025 (3d Cir. 1991)). The record shows that staff at SCI Huntingdon were aware the decedent had a history of suicide attempts in the past (Doc. 72, at 79), and the decedent had expressed suicidal thoughts after being downgraded to a "C code stability." (*Id.*, at 72). Therefore, the record supports the assertion that the decedent qualified as someone with both a serious mental health illness and a vulnerability to suicide, or at the very least, creates a genuine dispute of material fact as to the issue.

In the context of whether the decedent was placed in in solitary confinement for an extended period of time, it is undisputed that the decedent was placed in solitary confinement. The record shows that the decedent was subjected to isolation at least two times during his incarceration at SCI Huntingdon. *See* (Doc. 72, at 74) (noting the decedent's stay in restricted housing units from: (1) June 29, 2020 – July

1, 2020; and (2) July 6, 2020 — September 25, 2020).[11] However, there remains a genuine dispute of material fact about whether the decedent's stay in isolation constituted a prolonged period of time.

"[N]o bright line exists to say when the duration of solitary confinement contravenes the Eighth Amendment." *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 679 (W.D. Pa. 2019). But decisions by courts in this Circuit are instructive on the matter. On one spectrum, courts have found that exposure to years of solitary confinement serves as a sufficient duration for an Eighth Amendment claim. *Id.* (finding that seventeen years in solitary serves as sufficient time for a viable Eighth Amendment violation); *Williams*, 848 F.3d at 554 (finding twenty-two years in solitary confinement as a sufficient basis for an Eighth Amendment claim). Moreover, courts in this Circuit have found that months in solitary

---

[11] While neither party elaborates on the isolation conditions in restricted housing units, a report cited by the plaintiff concerning an investigation of the Pennsylvania Department of Corrections' use of solitary confinement on prisoners with serious mental illness notes that "[p]risoners in the RHUs are usually confined to their cells for roughly 23 hours a day." (Doc. 48-1, at 6). According to that same report, this isolation meets the definition of solitary confinement. *See* (*id.*, at 5) ("'Solitary confinement' means the state of being confined to one's cell for approximately 23 hours per day or more."). The Department of Justice's report will be discussed in further detail in later parts of this memorandum.

confinement can serve as an extended period of time for Eighth Amendment claims. *See Clark*, 55 F.4th at 180 (finding that seven months of complete isolation is sufficient to allege requisite deprivation); *see also Palakovic*, 854 F.3d at 216–17 (holding that "multiple 30-day stints in solitary confinement" over a period of thirteen months was sufficient to allege requisite deprivation). On the other side of the spectrum, courts have found that a period of weeks does not amount to an extended period of time. *See Stanford*, 2019 WL 5068666 at *13 (finding that four weeks in solitary confinement did not provide a sufficient basis for an Eighth Amendment claim). Here, the record shows that the decedent spent over seventy days in solitary confinement within a three-month period leading to his death, a period of time that falls in the middle that spectrum. (Doc. 72, at 74). We have not been directed to any precedent that conclusively determines whether seventy days in solitary confinement within a three-month period can serve as an extended period of time for an Eighth Amendment violation. Therefore, as there remains a genuine dispute of material fact, we conclude that a reasonable jury could find that the decedent's stay in solitary confinement serves as a sufficient duration for an Eighth Amendment

claim.

In sum, the Third Circuit has held that placing "inmates with known mental illnesses in conditions of extreme isolation for extended periods of time" constitutes an objective deprivation for purposes of an Eighth Amendment claim. *Clark*, 55 F.4th at 180. Here, although not conclusive, the record supports the contention that the decedent had a known mental illness and a vulnerability to suicide, and was subjected to solitary confinement for an extended period of time. At the very least, there remains a genuine dispute of material facts to be determined by a factfinder.

## II.    Subjective Prong

Once a party has sufficiently demonstrated a deprivation that is objectively serious, or at the very least provided enough evidence to support the contention, that party must prove that the defendants knew of and disregarded a substantial risk of harm to a prisoner. *Farmer*, 511 U.S. at 836.[12] The Third Circuit has elaborated that under the subjective

---

[12] This standard applies to both deliberate indifference to serious medical need claims and vulnerability to suicide claims. *See West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978) (finding that a deliberate indifference to serious medical needs involves "deliberate indifference on the part of

*(continued on next page)*

prong:

> To be liable on a deliberate indifference claim, a defendant prison official must both "know[] of and disregard[] an excessive risk to inmate health or safety." The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (quoting and citing *Farmer*, 511 U.S. at 837–38, 842, 844) (citations omitted) (alteration in original). Using this standard, to satisfy the subjective prong in this action, the plaintiff must show that each defendant knew that: (1) placing individuals with mental illnesses in solitary confinement for an extended period of time constituted an Eighth Amendment

---

prison officials"); *See also Palakovic*, 854 F.3d at 223–24 (stated that a vulnerability to suicide claim involves the element: "(3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.").

violation; and (2) that the decedent's placement fit that criterion.

## A.    Defendant Wetzel

The plaintiff attempts to hold defendant Wetzel liable under the first theory of supervisory liability, contending that defendant Wetzel was responsible for authorizing and implementing the policy of placing prisoners with mental illnesses in solitary confinement under conditions exacerbating their mental illnesses. (Doc. 65, at 9). Therefore, to show defendant Wetzel's deliberate indifference in this matter, the plaintiff must first show that defendant Wetzel had knowledge that placing prisoners like the decedent in solitary confinement for an extended period caused an excessive risk to those prisoners' safety. Second, the plaintiff must show that defendant Wetzel disregarded that risk by authorizing and implementing the problematic policy despite that knowledge.

In December of 2011, the United States Department of Justice ("DOJ") initiated an investigation of the Pennsylvania Department of Corrections ("PDOC") under the Civil Rights of Institutionalized Persons Act (CRIPA), which prohibits a pattern or practice of the deprivation of constitutional rights of individuals confined to state or local government-run correctional facilities. (Doc. 48-1). The investigation focused on,

among other areas, issues concerning prisoners with mental illness and intellectual disabilities and their placement in solitary confinement under conditions that violated their constitutional rights. On February 24, 2014, the DOJ issued a findings letter detailing the results of its investigation into the use of solitary confinement on prisoners with serious mental illnesses at PDOC. The findings included the following:

· The manner in which PDOC subjects prisoners with severe mental illnesses to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care;

· The manner in which PDOC uses solitary confinement on prisoners with severe mental illnesses results in serious harm;

· Numerous systemic deficiencies contribute to PDOC's extensive use of solitary confinement on prisoners with severe mental illnesses;

· The manner in which PDOC uses solitary confinement also harms prisoners with intellectual disabilities; and

· The manner in which PDOC uses solitary confinement often discriminates against prisoners with severe mental illnesses and intellectual disabilities.

(Doc. 48-1, at 3–5). In summary, the DOJ concluded that "PDOC's solitary confinement practices violate the Eighth Amendment's prohibition against 'cruel and unusual punishments.'" (*Id.*, at 4). Moreover, "PDOC's

use of a harsh form of solitary confinement for extended periods of time on hundreds of prisoners with [serious mental illnesses and intellectual disabilities] constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits." (*Id.*, at 5).

The record shows that defendant Wetzel had full knowledge of the DOJ's report, and thus, full knowledge of its conclusions that "PDOC's use of a harsh form of solitary confinement for extended periods of time on hundreds of prisoners with [serious mental illnesses and intellectual disabilities] constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits." (*Id.*); *see generally* John Wetzel Deposition transcript (Doc. 71-1) (acknowledging the DOJ's report in responses). Moreover, as one court in this Circuit has held, the Secretary has been named as a defendant in numerous other lawsuits in which courts recognized the negative impact of solitary confinement. *Johnston*, 431 F. Supp. 3d. at 680 (listing: (1) *Palakovich v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017); (2) *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777 (M.D. Pa. 2016); and (3) *Shoatz v. Wetzel*, No. 2:13-CV-0657, 2016 WL 595337 (W.D. Pa. Feb. 12, 2016)). Therefore, the plaintiff's contention that defendant Wetzel had knowledge that placing prisoners like the

decedent in solitary confinement for an extended period caused an excessive risk to those prisoners' safety is substantiated by record.

Moreover, the record supports the allegation that defendant Wetzel disregarded that risk by authorizing and implementing a policy that allowed staff to place prisoners with mental illnesses in solitary confinement for extended periods of time. The defendants concede that defendant Wetzel had personal involvement in implementing policy statewide (Doc. 63, ¶ 36(a)(i)), and thus, presumably authorized and implemented the policy at the heart of the alleged constitutional violations.[13] This concession creates a genuine dispute of material fact about whether defendant Wetzel authorized and implemented a policy of putting prisoners with mental illnesses in solitary confinement for extended periods of time. The plaintiff has identified adequate support in the record to substantiate her claim, and at the very least, a genuine dispute of material fact as to defendant Wetzel's deliberate indifference exists which precludes summary judgment.

---

[13] "[A] government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged unconstitutional conduct." *Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60, 71 (3d Cir. 2011).

## B. Defendants Spyker and Kohler

The plaintiff attempts to hold defendants Spyker and Kohler liable under the second theory of supervisory liability, arguing that both defendants were "aware of the policies and practices causing harm to those with serious mental illness" and those with a "vulnerab[ility] to suicide[,]" but "failed to take any measures to alter these policies and practices." (*Id.*, ¶¶ 92, 95). To show the defendants' deliberate indifference, the plaintiff must first show that both defendants were aware that placing individuals with mental illnesses in solitary confinement for an extended period of time constituted an Eighth Amendment violation.

The plaintiff contends that defendants Kohler and Spyker "were fully aware of the Department of Justice investigation and its findings … which were disseminated to all prison officials in Pennsylvania, condemning them for fostering conditions that escalated suicide rates among the mentally ill prison population." (Doc. 65, at 6). While the record fails to show the extent to which Kohler and Spyker knew about the conclusions within the investigation, it does reflect that defendants Kohler and Spyker were aware of the investigation. *See* Spyker

transcript (Doc. 65-5, at 2,3) ("I'm aware of the document … The title is the Investigation of the Pennsylvania's Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities."); *see also* Kohler transcript (Doc. 65-6, at 2) ("So I'm partially familiar with the DOJ investigation… It was a DOJ investigation that was on the department, oh, probably ten or twelve years ago."). Because there is evidence in the record concerning the defendants' knowledge of the report, there remains a dispute of material fact regarding defendant Kohler's and defendant Spyker's awareness that solitary confinement for extended periods of time concerning prisoners with mental illnesses "constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits." (Doc. 45-1, at 5).

Moreover, there remains a factual dispute about whether defendants Spyker and Kohler knew that the decedent had a serious mental illness and vulnerability to suicide, and showed deliberate indifference by allowing him to remain in solitary confinement for an extended period. At the time of the decedent's incarceration, defendants Kohler and Spyker both served on the Program Review Committee. (Doc.

63, ¶¶ 38(c)(i), 40(c)(i)) ("During the relevant time period, Kohler participated in eight (8) Program Review Committee ("PRC") reviews with the Decedent" and "During the relevant time period, Spyker participated in five (5) Program Review Committee ("PRC") reviews with the Decedent."); *see generally* (Doc. 63-6). The Administrative Custody Procedures Manual dictates that "[a]t least every 30 days, the Program Review Committee (PRC) shall ensure each such inmate is reviewed to determine whether there is a continuing need for separation from the general population." DC-ADM 802, Administrative Custody Procedures Manual at § 1(A)(7). Indeed, the record shows that the PRC played a direct role in determining whether the decedent remained in solitary confinement or returned to the general population. *See* PRC Review Notes (Doc. 63-6, at 3,11) ("Inmate was seen for an 802 review. Inmate was continued on AC status pending a possible rewrite" and "[t]here are no mental health concerns at this time to preclude continued placement."). But at this stage, it is unclear exactly which documents the PRC reviews when determining whether an inmate should return to the general population. Neither party has produced any evidence that determines conclusively whether the PRC would have reviewed

documents consisting of the decedent's history of mental health. However, the PRC review notes imply that the Committee had some awareness of the decedent's mental health past, s*ee* PRC Review Notes (Doc. 63-6, at 11) ("There are no mental health concerns at this time to preclude continued placement."), and as we noted above, there is sufficient evidence in the record that the staff at SCI Huntington knew that the decedent was diagnosed with a mental illness and had a vulnerability to suicide. (Doc. 72, at 75). Therefore, while not conclusive, there remains a genuine dispute as to the defendants' knowledge of the decedent's serious mental illness and vulnerability to suicide. The plaintiff has identified adequate support in the record to substantiate her deliberate indifference claims against defendants Spyker and Kohler and we find that a genuine dispute of material fact exists which precludes summary judgment. The defendants' motion for summary judgment concerning claims against defendants Kohler and Spyker will be denied.

## IV.    Conclusion

For the foregoing reasons, the defendants' motion for summary judgment will be denied.

An appropriate order follows.


Dated: October 9, 2025                    *s/Joseph F. Saporito, Jr.*
                                          JOSEPH F. SAPORITO, JR.
                                          United States District Judge