IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAMARIA NELSON, as Administrator of the Estate of Shaka Nelson, | : | Civil Action No. 1:23-CV-01030-JFS |
| | : | (SAPORITO, J.) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN WETZEL, JOEL KOHLER, and JILL SPYKER, | : | |
| | : | |
| | : | |
| Defendants. | | |

JOINT STATEMENT OF UNDISPUTED FACTS

Plaintiff Kamaria Nelson, as Administrator of the Estate of Shaka Nelson, and Defendants John Wetzel, Joel Kohler, and Jill Spyker, through undersigned counsel, jointly submit the following statement of undisputed facts pursuant to Federal Rule of Civil Procedure 16(c)(2)(C), Middle District of Pennsylvania Local Rules 16.3(b) and 16.6, Appendix B, and the Court's Trial Management Order, ECF 96. The parties stipulate to the factual propositions expressly stated below, subject to the qualifications concerning the scope of such stipulations.

Where a paragraph states what a document records, states, or contains, the agreement extends to that documentary content, not necessarily to the truth of every embedded assertion or to all inferences drawn from it. The parties may separately preserve specific admissibility or relevance objections, subject to the

Court's rulings and the applicable rules. No party may contradict the factual proposition that it has expressly stipulated to.

Agreement to a fact does not itself authenticate its source document, admit all of its contents into evidence, or establish every inference that may be drawn from the fact. Any agreement concerning admissibility, authentication, or use of particular source materials remains subject to express agreement and the Court's rulings.

Parties and responsibilities

1. Kamaria Nelson brings this action in her capacity as Administrator of the Estate of Shaka Nelson.

2. Shaka Nelson, DOC inmate number NV7089, was received at SCI Phoenix on June 7, 2019 and at SCI Camp Hill on July 5, 2019. He was incarcerated at SCI Huntingdon from September 10, 2019 through September 25, 2020.

3. John Wetzel was Secretary of the Pennsylvania Department of Corrections during Nelson's confinement at SCI Huntingdon.

4. Frederick Henry and Christiana Nelson are Shaka Nelson's parents.

5. Joel Kohler began working at SCI Huntingdon as Major of the Guard in 2018 and became Deputy Superintendent for Facilities Management at the beginning of 2020.

6. Jill Spyker served as Corrections Classification and Program Manager at SCI Huntingdon before becoming Deputy Superintendent for Centralized Services at the end of June 2020.

7. Spyker has an undergraduate degree in psychology and a master's degree in counseling. She worked in DOC psychology positions for approximately eight or nine years before becoming a unit manager. She testified that she is not licensed.

8. Kohler and Spyker served on the Program Review Committee at SCI Huntingdon. The committee reviewed continued restricted housing and release to the general population.

9. The SCI Huntingdon single-cell review process used a vote sheet on which institutional staff, including the deputies, could record recommendations on a requested Z code.

10. Kohler and Spyker each testified that they did not participate in assigning Nelson's mental-health stability code.

11. During his tenure as Secretary of Corrections, John Wetzel oversaw the Department's operations. Training and policy personnel reported directly to him.

12. Wetzel led the Department's effort to respond to the mental-health and restrictive-housing issues addressed in the Disability Rights Network litigation and the Department of Justice investigation. Wetzel cooperated with the DOJ, provided documents, and allowed access to institutions.

13. Wetzel testified that Department policies generally were implemented statewide, although some specialty programs were institution-specific, and that mental-health policies would be implemented statewide.

DOJ correspondence and the defendants' described awareness

14. The United States Department of Justice issued a findings letter dated February 24, 2014, concerning the Pennsylvania Department of Corrections' use of solitary confinement on prisoners with serious mental illness or intellectual disabilities. The letter was addressed to Governor Tom Corbett and lists John E. Wetzel among its copy recipients. The copy list also identifies Tabb Bickell as Superintendent of SCI Huntingdon.

15. The 2014 findings letter states that DOJ conducted on-site inspections at six Pennsylvania prisons in August 2013 and reviewed documents concerning solitary confinement at all 26 Pennsylvania prisons before, during, and after those visits. The six listed inspection sites were SCI Greene, Fayette, Smithfield, Rockview, Muncy, and Dallas.

16. The 2014 findings letter reported that the manner in which the Department used prolonged solitary confinement on prisoners with serious mental illness exacerbated their illness and led to harms including mental deterioration and self-harm. The letter explains that its assessment considered conditions, duration, available services, security and penological concerns, and mechanisms for mitigating harm; it did not characterize every use of solitary confinement on such prisoners as a per se violation.

17. The 2014 findings letter acknowledged that the Department had begun changing disciplinary procedures and treatment protocols, that the reforms had reduced the number of prisoners with serious mental illness in solitary confinement, and that additional policies were being drafted.

18. The 2014 findings letter identified coordination and continuity of care, recordkeeping, mental-health staff influence on housing decisions, and oversight mechanisms as areas of concern. It reported that vital mental-health information was sometimes missing or scattered among records not readily accessible to mental-health staff.

19. Wetzel testified that Pennsylvania had overused restrictive housing for individuals with mental illness, that this overuse resulted in self-injurious behavior, suicide attempts, and completed suicides, and that those outcomes drove the DOJ investigation and the Disability Rights Network litigation.

20. Wetzel received the DOJ findings letter issued in 2014 and, on the day he received it, emailed it to the Department's employees with an instruction to read it. His accompanying message stated that the Department would contest matters it considered inaccurate and fix matters it considered accurate.

21. At his deposition, Kohler testified that he was partially familiar with the DOJ investigation concerning solitary confinement and mental illness, and that he knew it had affected Department operations.

22. At her deposition, Spyker testified that she recognized the February 24, 2014 DOJ letter, was aware of it when it came out, and had skimmed it.

23. In a letter dated April 14, 2016, addressed to Governor Tom Wolf, DOJ stated that it was closing its investigation in light of significant improvements in the Department's policies and practices. The letter states that DOJ had confirmed initial reforms through site visits and document review and that the Department had addressed, or provided sufficient plans to address, DOJ's primary concerns about those reforms.

24. The April 2016 closing letter described reforms including diversion to specialized treatment units, mental-health evaluation in serious misconduct cases, informal resolution of nonviolent misconduct involving prisoners with serious mental illness or intellectual disabilities, an end to discipline for self-

injurious behavior, and offers of at least 20 hours per week of out-of-cell activity and treatment for that population.

25. The April 2016 closing letter also identified areas requiring continued improvement, including mental-health recordkeeping and quality assurance, and recommended monitoring participation and an inmate's entire length of stay in specialized units to avoid deterioration.

26. The April 2016 closing letter stated that DOJ would continue to receive and review complaints about conditions in Pennsylvania prisons and closely scrutinize allegations concerning housing and treatment of prisoners with serious mental illness or intellectual disabilities. It identified the possibility of another investigation if DOJ later had reasonable cause to believe there was a pattern or practice of constitutional violations.

27. When asked at his deposition about the first bullet in the 2014 DOJ letter's summary of findings, Wetzel testified that the matter had been resolved through the checks and balances he described and that the agreed independent expert had verified the resolution. He further testified that every finding in the letter had been resolved.

28. As part of the Department's response, Wetzel sought to use the A, B, C, and D mental-health coding system to communicate inmates' mental-health status to the staff supervising them and to inform custody decisions.

29. Wetzel testified that an A or B designation removed the clinical review of RHU placement and conditions that he had described and directed an inmate to a regular RHU rather than a programmatic RHU designed for inmates with mental illness.

30. Wetzel described quarterly inspections of each facility at the deputy-secretary level to check adherence to the mental-health policies he discussed, and testified that these checks remained in place through the end of his tenure.

Identified policy versions and written procedures

31. The identified DC-ADM 802 Administrative Custody Procedures policy identifies John E. Wetzel as its issuing authority and carries an issue date of October 31, 2016, and an effective date of November 14, 2016. Its Section 1 carries an effective date of April 23, 2019; Section 4 carries an effective date of December 18, 2018.

32. The identified 13.8.1 Access to Mental Health Care policy identifies John E. Wetzel as issuing authority and carries an issue date of December 23, 2019,

and an effective date of December 30, 2019. Section 1 carries an effective date of February 6, 2017, and Section 2 carries an effective date of August 31, 2018.

33. The identified DC-ADM 801 Inmate Discipline policy has an issue date of May 16, 2022, an effective date of May 23, 2022, and identifies George M. Little as issuing authority. Within that compilation, Sections 1 and 4 carry an effective date of September 27, 2018; Section 6 carries an effective date of November 24, 2016; Section 5, concerning appeals, carries an effective date of May 23, 2022.

34. Section 2 of the identified DOC Policy 5.1.1 Training and Staff Development compilation bears an issue date of July 25, 2016, and an effective date of August 1, 2016.

35. That section assigns Department training management to the Director of Staff Development and Training, facility training compliance to the Facility Manager, and planning, monitoring, reporting, and recordkeeping responsibilities to the facility Training Coordinator. It calls for training appropriate to employee classifications and duties and for managers and supervisors to ensure completion of annual mandatory training.

36. The same section addresses Department-approved lesson plans, certified instructors, training audits and corrective action, and specified employee exceptions.

37. Section 3 of the identified DC-ADM 802 describes administrative custody as a non-disciplinary status used to separate an inmate from general population for specified safety, security, or management reasons.

38. For an inmate with mental illness, DC-ADM 802 §1.B.6 states that the PRC should explore the feasibility of SRTU, RTU, or SNU placement as an alternative, provided the inmate's safety is not jeopardized. If safety cannot reasonably be assured outside AC, it requires appropriate mental-health services while the inmate remains in AC.

39. The general AC review schedule in DC-ADM 802 §2.D calls for PRC review every seven days during the first two months of AC, weekly counselor contacts, and Unit Management Team review after 30 days and every 30 days thereafter. After the first 60 days, PRC is to interview the inmate every 90 days unless an earlier review is recommended; an inmate remaining in AC more than 30 days is to receive a personal mental-health assessment, with subsequent assessments at least every 90 days. For inmates placed in involuntary AC because of a high risk of sexual victimization or after alleged sexual abuse, §2.D.6 requires continued PRC review every 30

days. For those involuntary protective placements, §1.A.6 permits AC only until an alternative means of separation from likely abusers can be arranged and states that placement ordinarily should not exceed 30 days. Section 1.A.7 requires the PREA Compliance Manager to participate in PRC review of PREA-related cases.

40. Under DC-ADM 802 §4.A.2-3, the Facility Manager or designee or PRC may release an inmate from AC to general population at any time, except for a capital-case inmate or an inmate on the Restricted Release List. The listed considerations include RHU duration, misconduct history, safety and risk, behavior and hygiene, and recommendations of unit and treatment staff.

41. DC-ADM 801 §1.B.4 requires the Shift Commander's misconduct investigation to determine the inmate's mental-health status and provides for a daily active MH/ID roster from psychology. It directs informal resolution of nonviolent charges numbered 26 through 52 for an inmate on that active roster unless the Shift Commander provides a material justification, with specific details of an imminent institutional security risk, for formal proceedings; an insufficient justification is to be rejected by the Hearing Examiner. Drug-related misconducts are excluded from informal resolution.

42. DC-ADM 801 permits the charging staff member or Shift Commander to refer an inmate to psychology regardless of roster status when behavior

suggests serious mental illness. Its hearing procedures also direct postponement and a mental-health referral when an inmate outside the active MH/ID roster appears to show active mental-health symptoms or behavior suggesting intellectual disability.

43. For an active MH/ID inmate's disciplinary matter, DC-ADM 801 §1.D.5-10 provides for transmission of a consultation form and misconduct report to psychology, an assessment interview within 24 hours after the LPM or designee receives the misconduct report and consultation form, or as soon as normal facility operations permit, an offered out-of-cell interview, and findings sent to the decision maker. The evaluator is not to have a current treatment relationship with the inmate, and the decision maker is to consider any mental-health recommendations before disposition.

44. DC-ADM 801 §4.B.4(b) provides that an inmate with serious mental illness is to serve disciplinary custody in a Diversionary Treatment Unit. It permits temporary RHU placement in exceptional circumstances such as unavailable DTU or SRTU beds, but not when RHU placement has been clinically identified as inappropriate. When the specified bed-unavailability circumstances require temporary RHU placement, an immediate transfer petition is required, and the temporary RHU placement may not exceed 13 days.

45. For an inmate with serious mental illness temporarily placed in RHU under DC-ADM 801 §4.B.4(b), the policy calls for DTU-equivalent privileges, including an offer of at least 20 hours of out-of-cell activity per week, 10 structured and 10 unstructured, beginning on the first day. The RHU Unit Manager or designee is to email the weekly activity logs to the Licensed Psychologist Director and the Regional Licensed Psychologist Manager.

46. DC-ADM 801 §4.B.7 requires PRC to consider release to general population after half the sanction for misconducts other than charges 1 through 14. Charges 1 through 14 ordinarily are to be served in full, with an exception permitted for an inmate on the MH/ID roster if mental-health staff recommend reduction. Section 4.B.8 also permits the Facility Manager or designee to reduce other sanctions at any time based on institutional security needs.

47. DC-ADM 801 §6.A requires PRC interviews every 90 days in disciplinary custody unless the Unit Management Team recommends earlier review, weekly counselor contact, and monthly Unit Management Team review. It provides for recording the weekly and monthly contacts in ICAR and forwarding an early-release recommendation to PRC when appropriate.

48. Section 2.A of the identified 13.8.1 manual distinguishes A status, involving no identified psychiatric or intellectual-disability need or treatment history;

B status, involving a treatment history other than SMI or ID but no current psychiatric-treatment need or regular psychological follow-up; C status, involving current psychological treatment without the listed SMI, functional-impairment, ID or GBMI criteria; and D status, involving current SMI, ID, credible functional impairment or GBMI. It places B-status inmates on the inactive MH/ID roster.

49. The Department used the D designation to guide inmate treatment and housing conditions for the safety and well-being of the inmate, staff, and general inmate population.

50. Section 2.B.1 of the identified 13.8.1 manual includes bipolar I and II diagnoses among the listed serious-mental-illness diagnoses when the PRT determines that an inmate has a current diagnosis or recent significant history. The listed diagnoses include F31.2, bipolar I, current or most recent manic episode with psychotic features, and specified remission diagnoses. The same provision defines recent significant history as currently existing or within the preceding three months. F31.0, BIP I, current or most recent episode hypomanic

51. For inmates confined in Security Level 5 units, including RHU, 13.8.1 §1.B.2.c(2)(f) provides for psychology staff to visit the unit five times per week, for assessment of every new placement for suicide potential, and for

review of the DC-510 checklist. It directs assessments and written reports to address continued suitability for Level 5 confinement and deterioration or its absence, and expects assessments also to include suicide risk and protective factors.

52. Under 13.8.1 §1.B.2.c(2)(f)(v), psychology staff are to personally interview and assess A- and B-roster inmates in Level 5 housing monthly, make a DC-560 report in the medical record and an ICAR contact entry, and make recommendations to PRC about AC or DC inmates who may be released.

53. Under 13.8.1 §1.B.2.c(2)(f)(xi), the LPM or Mental Health Coordinator is to provide the commissioned officer in charge of Level 5 housing a weekly list of inmates on the active mental-health roster and inmates considered to display suicide-risk factors. The list is intended to assist security staff's day-to-day interactions and decisions and is to remain in the secured control area.

54. Under 13.8.1 §1.B.2.d(1), an original psychological evaluation is to be placed in the integrated medical record, a copy in the DC-15 inmate record, and a notation of the evaluation's purpose and date in ICAR. The policy permits access by the Treatment Team, generally including deputy superintendents, and limits disclosure to authorized participants.

55. The identified 13.8.1 manual requires PRT approval before removal of an inmate from the active MH/ID roster, documentation of the rationale and date in the psychiatric section of the medical record, and placement on the inactive roster with a corresponding tracking-system entry.

56. Section 2.E.3 of the identified 13.8.1 manual directs facilities to provide for staff observations to reach appropriate treatment personnel, requires acknowledgment by the receiving treatment staff member, identifies DC-97 as the referral form, and directs treatment staff to share recovery-plan goals and direction with corrections officers and other staff.

57. Section 1.H.1 of 13.8.1 calls for the Central Office Special Needs Psychiatric Review Team to meet monthly and review matters including specialized-program waiting lists, unit populations, and monthly and year-to-date suicides, serious attempts and self-injury. The policy calls for distribution of its packet to members, facility managers, Regional LPMs and the psychiatric-service contractor, and escalation of significant or unresolved issues to the Executive Deputy Secretary.

58. Under 13.8.1 §1.F.2(b)-(c), Regional Licensed Psychologist Managers are to visit assigned facilities and complete compliance reports at least quarterly. The reports are to be submitted to the Secretary, Executive Deputy Secretary, relevant Regional Deputy Secretary and Chief of Psychology, and

are to cover the measurable areas of the Technical Compliance Consultant Matrix.

59. The suicide-risk section of the identified 13.8.1 manual identifies prior suicidal behavior and repeated self-injury as risk considerations. Its list of possible stressors includes RHU or SMU placement, unexpected misconduct punishment, cell restriction, and transitions including release from POC or placement into RHU. It states that a person considering suicide need not display every listed signal and that every attempt, including gestures, is to be taken seriously.

60. Under 13.8.1 §2.K.2(f), a DC-510 suicide-risk checklist is to be completed for every inmate entering Level 5 housing. If specified indicators are present, staff are to obtain the stated prompt nursing or psychological assessment; even without identified indicators, nursing or psychology is to assess the inmate within 24 hours. The completed form is to remain in ICAR until reviewed by PRC.

61. DC-ADM 801 §6.A states that a DC inmate does not have radio, television, telephone, kiosk/tablet or ordinary personal-property privileges unless PRC approves them. A Unit Manager or commissioned officer may separately approve a telephone call in a verified emergency. The section also provides

limited visits, one hour of exercise per day five days per week, and at least three showers per week.

62. DC-ADM 802 §3 provides that ordinary AC initially limits radio, tablet, television and telephone privileges, with emergency and legal-call exceptions, and calls for exercise opportunities and hygiene access. It permits specified additional privileges based on individual needs, security and behavior, with documented reasons for deviations.

63. DC-ADM 802 §4.A.5 permits discharge from POC only following face-to-face assessment and a written order by the psychiatrist or psychiatric nurse practitioner. It separately requires the nursing supervisor to notify PRC of planned discharges so PRC may arrange appropriate housing.

Mental health records from June through December 2019

64. The Initial Reception Mental Health Questionnaire signed by Sarah Schnatter on June 7, 2019, records that Nelson reported depression and prior suicidal ideation and stated that, in 2012, he had tried to hang himself and cut his wrists. The same questionnaire records no current thoughts of self-harm and no current suicidal ideation expressed or elicited. The questionnaire also records Nelson's report that he was currently prescribed 800 milligrams of Seroquel, had taken Seroquel since 2016, and used it to manage depression and anxiety.

65. The reception screening signed by Charles Bolli on June 7, 2019, records affirmative responses concerning feeling down, depressed or anxious, hearing voices or seeing things others could not, perceived control of thoughts, and a plot or conspiracy. It records negative responses concerning prior self-harm or suicide attempts and current thoughts of self-harm.

66. Dr. Saiqa Mushtaq's psychiatry progress note signed July 30, 2019, contains checked findings of grandiose, paranoid, and religious delusions and a checked response of None under Suicidal.

67. Dr. Mushtaq's psychiatry progress note signed August 7, 2019, lists Bipolar I disorder, current or most recent episode manic, with psychotic features, code F31.2, as a diagnosis entered by Dr. Mushtaq on August 7, 2019. The same note checks "Paranoid" under Delusions and "None" under Suicidal, Homicidal, and Hallucinations.

68. The DCC Psychological Assessment Report closed August 12, 2019, assigns Nelson a D mental-health stability rating, identifies suicide-behavior risk based on a history of suicidal behaviors, and states that, because of the D rating, he would be followed by psychiatry and psychology and housed in an RTU. The report also states that he required significant monitoring by the Psychiatric Review Team, records his denial of current suicidal or self-harm

thoughts or behaviors, and explains that no suicide-potential index was provided because the PAI results were invalid.

69. When Nelson transferred to SCI Huntingdon on September 10, 2019, he retained his D mental-health status and Bipolar I diagnosis.

70. The Huntingdon Initial Reception Mental Health Questionnaire dated September 10, 2019, and signed September 12, 2019, records Nelson's reported history of attempted hanging, cutting, and attempting to jump from a roof. It also records negative responses concerning current thoughts of self-harm and a plan to continue regular contact.

71. The September 19, 2019 psychiatry PRT note records Nelson's statement that he was refusing Seroquel because he was not comfortable with a cellmate and his statement, 'I'm not in a cell by myself. I don't know what is going to happen. It's not going to be my fault.' The note also states that the regional psychiatrist had approved the taper request and that Nelson had refused all Seroquel doses since September 11. It records that he was advised about medication risks and benefits, access to psychiatric treatment including urgent concerns, and participation in RTU programming and treatment.

72. The psychiatry note signed by Dr. Camacho on October 4, 2019, documents discontinuation of Seroquel after nonadherence to the taper and includes a plan for continued monitoring and psychology treatment.

73. Nelson's D-to-C Roster Downgrade Request Form is dated November 24, 2019. Its approval entries identify Jessica Cousins, Mark Peters, Adam Bloom, and Richard Goss, with Goss's approval dated November 26, 2019.

74. Mark Peters's December 2, 2019 contact note records Nelson's statements that he did not feel safe around others, did not know what he would do with another cellmate, was hearing voices, and did not believe he was receiving adequate treatment. Peters recorded paranoid ideation, agitation, and low frustration tolerance, while also recording no suicidal ideation, self-injurious behavior, or homicidal ideation.

75. The December 3, 2019 Psychiatric Observation Cell orders directed Nelson's admission to a POC on constant one-to-one watch for suicidal ideation without a plan following loss of his D stability code.

76. The December 5, 2019 POC discharge summary lists admission on December 3 and discharge on December 5. It records that Nelson denied suicidal and homicidal ideation and self-injurious thoughts at discharge and that the planned disposition was general population with a cellmate.

<u>Housing and mental health records from June 2020 through September 2020</u>

77. The cell-history spreadsheet records RHU housing from June 10 through June 24, 2020, followed by general-population housing from June 24 through June 29, 2020.

78. The cell-history spreadsheet records RHU housing from June 29 through July 1, 2020, followed by general-population housing from July 1 through July 6, 2020.

79. The cell-history spreadsheet contains successive RHU entries beginning July 6, July 8, September 1, and September 18, 2020, with the final RHU entry ending on September 25, 2020. It contains no intervening general-population entry between those four entries.

80. The last entry in the cell-history spreadsheet identifies cell HUN-G-B-1004-01, housing type RHU, from September 18 through September 25, 2020.

81. A Mental Health Referral Form dated June 15, 2020, at 15:22 identifies Richards as the referring staff member and 'Z code evaluation' as the purpose. The action entry states that the referral was assigned to PSS Diehl for evaluation and bears the date June 16, 2020.

82. The June 23, 2020 psychiatry progress note records a change to B status and removal from the mental-health roster. The plan directed cancellation of

further scheduled psychiatry appointments at that time, return to psychiatry as needed, and continued psychology contact while Nelson remained in the RHU.

83. The June 23, 2020 contact records attribute to Nelson statements that his mood was not good, that he had lost a family member, and that Seroquel was the only medication that had helped him. They also record that he declined grief/loss counseling and other psychiatric medications and denied suicidal and homicidal ideation and thoughts of self-injury.

84. The June 23, 2020 psychiatry progress note states: 'Inmate reported a history of multiple suicide attempts and is not a candidate for a single cell per psychiatry and PRT.'

85. The Suicide Risk Indicators Checklists dated June 29, 2020, and July 6, 2020, each have No circled for all fourteen listed indicators, including the item asking whether the escorting officer had information that Nelson might be a suicide risk based on self-harm or suicide-attempt history.

86. The printed DC-510 instructions on the June 29 and July 6 checklists direct a psychology assessment within twenty-four hours even when all answers are No, with a nurse permitted to assess when psychology staff are not scheduled to work and a psychology reassessment when they return. The

printed instructions direct the original completed form to Medical Records and the yellow copy to PRC for review and filing in DC-14.

87. An administrative note signed by Angela Lusk, RN, on July 8, 2020, at 10:17:24 states, “NOTIFIED RHU INMATE IS TB CLEARED.”

88. The Psychological Evaluation for Z-Code Evaluation bears a closure date of July 17, 2020, at 1:14:06 p.m. It identifies July 16, 2020 case-file and Sapphire review and states that a clinical interview was not required. Its signature page identifies Kirsten Leigh Butterbaugh and Mark Peters.

89. The July 17, 2020 Z-code evaluation states that Nelson appeared to meet single-cell criteria based on assaultive and predatory behavior, but also states that his history of suicide attempts should discourage a single-cell assignment under recent policy revisions. It therefore recommends deferring Z-code consideration to security.

90. The July 24, 2020 psychology contact note, electronically signed by Trista Conway, records that Nelson reported a recent loss and sought an extended out-of-cell discussion. It records no current suicidal ideation expressed or elicited and marks the single thinking category “Grossly Impaired/Illogical, Fragmented/Confused.” It also records intact memory and orientation and impairment findings within normal limits. The narrative states that Nelson

did not appear emotionally distressed or in crisis and describes repeated demands and attempts to manipulate the interaction. The plan calls for continued regular contact.

91. The August 21, 2020 psychology contact note records that Nelson was offered an out-of-cell interview and elected to speak at his RHU cell door. It records his denial of mental-health concerns and suicidal or homicidal ideation and the clinician's observation of no acute emotional distress.

92. The psychology contact note electronically signed by Trista Conway on September 9, 2020, records no current suicidal ideation expressed or elicited. It marks behavior as uncooperative, angry, hostile, demanding, controlling, and agitated, and marks the single thinking category “Grossly Impaired/Illogical, Fragmented/Confused.” It also marks perceptions as “Grandiose.” The same note records intact memory and orientation and impairment findings within normal limits, states “within baseline for contacts with this writer,” and provides for continued regular contact.

93. The September 9, 2020 DC-560 records No for whether out-of-cell time was offered. Its explanation states: 'Inmate initially refused out of cell, but this would not have been provided regardless due to inmate’s hostile attitude and aggressive presentation.'

Dated votes grievances disciplinary decisions and PRC entries

94. In grievance 824051, dated September 15, 2019 and acknowledged received September 17, 2019, Nelson requested a single cell and wrote that he had stopped taking medication, was “not cleaning anymore,” could not focus on his legal work, and was “slowly but surely” losing himself.

95. The DC-46 H-code review sheet with a September 19, 2019 staffing date displays stability code D and bears affirmative H-code recommendations in the rows for J. Spyker, CCPM, and J. Kohler, Major. Both entries are dated September 19. Spyker’s comment refers to an assaultive history.

96. The September 30, 2019 initial response to grievance 824051, signed by P. Lechner, stated that Nelson’s unit team was reviewing single-cell status through a vote-sheet process and denied the grievance.

97. The November 13, 2019 ICAR PRC entry lists Major Kohler and CCPM Spyker among the participants and records continuation of disciplinary custody. It states that there were no mental-health concerns at that time precluding continued placement. The entry also records that Nelson was encouraged to remain misconduct free and attend out-of-cell programs and that he had no concerns.

98. The November 27, 2019 ICAR PRC entry lists Major Kohler and CCPM Spyker, states that Nelson refused the review, and records continuation of disciplinary custody with no mental-health concerns then said to preclude placement.

99. The December 4, 2019 ICAR PRC entry lists Major Kohler and CCPM Spyker, states that Nelson was not seen because he was in observation, and records that he would be released to the general population when discharged from the psychiatric observation cell.

100. The DC-46 H-code review sheet with a June 3, 2020 staffing date displays stability code D and bears affirmative H-code recommendations in the rows for J. Spyker, CCPM, and J. Kohler, DSFM. Kohler's recommendation is dated June 10. The superintendent/designee line bears the handwritten notation "Kohler for KK" and is dated June 10, 2020.

101. The June 12, 2020 hearing report for misconduct D536832 records a guilty disposition on charge 33, dismissal of charge 35, and a sanction of fifteen days of disciplinary custody and loss of job, effective June 10, 2020.

102. The June 10, 2020 mental-health consultation form in the D536832 packet records "Yes" for serious personality disorder and suicide-attempt history, "No" for a current serious mental-illness diagnosis, and "No" for

contraindications to potential segregation because of an inability to tolerate sanctions.

103. In the D536832 appeal dated June 24, 2020, Nelson accepted responsibility for his actions and choice of words and asked that the misconduct be reduced from Class I to Class II.

104. The June 24, 2020 ICAR PRC entry lists Deputy Kohler and records that Nelson was released to the general population on a recommendation from security.

105. The PRC decision on D536832 has a review date of July 6, 2020 and upholds the hearing examiner's sanction. It bears a Kohler signature dated July 7 and a Spyker signature dated July 10.

106. In grievance 878314, dated July 13, 2020 and stamped received July 16, Nelson requested a permanent Z code, claimed emotional and mental distress, and asked to remain in isolation until receiving a tuberculosis shot.

107. A July 16, 2020 memorandum from Connie Green assigned grievance 878314 to Ms. Spyker for a response and specified an August 6 response date.

108. The DC-46 sheet with a July 21, 2020 staffing date identifies two purposes: "Z Code for Single Cell" and "Remove O Code." The header displays stability code B.

109. The July 21, 2020 vote sheet states that Nelson requested a Z code because he had six cellmates within six months and "a bad case of racing thoughts" that could cause mental, physical, and spiritual damage.

110. The same vote sheet states that a July 17, 2020 psychological evaluation found that Nelson met criteria for Z-code consideration based on assaultive and predatory behavior toward other inmates, but also had a history of suicide attempts that "should discourage single cell assignment." It further states that the behaviors appeared motivated by obtaining a single cell and that psychology deferred consideration to security.

111. On the July 21 vote sheet, Spyker's row is dated July 28, 2020 and records affirmative votes for both the Z code and removal of the O code. Her comments refer to an assaultive housing concern and stability B.

112. The July 29, 2020 ICAR PRC entry lists Deputy Spyker and Deputy Kohler and records that Nelson was released to the general population on a recommendation from security.

113. The July 29, 2020 report for misconduct D487532 states that, when told he was going to the general population, Nelson replied: “No, I’m not going to pop, I fear for my life.”

114. The July 31, 2020 hearing report for D487532 records a guilty disposition on charge 35 and thirty days of disciplinary custody effective July 29, 2020.

115. On the July 21 vote sheet, Kohler’s row is dated August 3, 2020 and records affirmative votes for both the Z code and removal of the O code.

116. In the D487532 appeal dated August 3, 2020, Nelson asserted that his refusal of TB testing required his isolation until medically cleared and described the handling of his releases to population as “extremely harsh and prolonging.”

117. The July 21 vote sheet bears superintendent approval dated August 4, 2020 for the Z code and removal of the O code, with a comment referring to assault history and PREA.

118. The August 6, 2020 ICAR entry by Richards states that Nelson received institutional support for a Z code and removal of the O code and that the packet was sent to RDS Ferguson for consideration.

119. The PRC decision on D487532 has a review date of August 7, 2020, repeats Nelson’s statement that he feared for his life and his TB-related explanation

for the appeal, records the decision's medical-clearance rationale, and sustains the hearing examiner's decision and sanction.

120. The August 7, 2020 D487532 PRC decision bears Spyker's signature dated August 11, 2020 and Kohler's signature dated August 12, 2020.

121. The initial review response to grievance 878314 is dated August 20, 2020 and is signed by J. Spyker, DSCS, with the handwritten date August 20, 2020.

122. In that response, Spyker wrote: "On 07/07/20, I received information from RN Lusk," and described information about Nelson's refusal of TB testing, refusal of a chest X-ray, and medical clearance.

123. Spyker's August 20 response upheld grievance 878314 in part because Nelson had been released to population before medical clearance; it denied the requested relief.

124. Spyker's August 20 response stated that Nelson's request for a single cell had been processed by CCII Richards, supported by the institution, and was pending final approval from Central Office.

125. Nelson's appeal of grievance 878314 is dated August 21, 2020 and stamped received August 27. It adds allegations about psychiatric-diagnosis changes,

stopped medication, sexual advances or assaults, and fear associated with returning to population.

126. The August 26, 2020 ICAR PRC entry lists Deputy Kohler and Deputy Spyker and records release to the general population on a recommendation from security.

127. Superintendent Kauffman's August 26, 2020 decision sustaining D487532 lists Deputy Kohler and Deputy Spyker in the copy-distribution notation.

128. The September 2, 2020 PRC form for Other Report D434893 records continued administrative custody pending a possible misconduct rewrite. The form bears Kohler's signature dated September 9, 2020. The form also states that Nelson was personally interviewed for an 802 review and had no concerns.

129. The September 9, 2020 hearing report for misconduct D572461 records a guilty disposition on charge 35 and thirty days of disciplinary custody effective August 26, 2020.

130. Kauffman's September 15, 2020 response to grievance 878314 states that Spyker reported institutional support for a single cell with final approval pending in Central Office. It also attributes to her a statement that there was no reason to believe Nelson had been continuously mistreated because of his

place of origin or ethnicity. The response states that the sexual-assault, medication and diagnosis, cellmate, and July 28 fear allegations were not in the initial grievance and would not be addressed on that appeal. It states that the sexual-assault complaints were referred to the PREA Compliance Manager for review under DC-ADM 008 and that misconduct issues were addressed under DC-ADM 801.

131. The September 22, 2020 ICAR entry by Marilyn Richards records that Nelson said he had many mental-health issues and would not be safe returning to population through the proposed program, and that Richards told him PRC would discuss the program and his willingness to participate. The entry ends by stating that Nelson did not have any "concerns" to document that day.

132. The September 23, 2020 ICAR PRC entry lists Deputy Kohler and Deputy Spyker and records that Nelson was moved to administrative custody pending PCU placement. It states that he had no concerns and gives December 16, 2020 as the next review date.

133. The PRC form with a September 23, 2020 review date for Other Report D434898 states that Nelson had completed a disciplinary-custody sanction and would remain in administrative custody pending possible PCU placement. It schedules a Unit Team review for October 21 and a PRC

review for December 16, 2020. The form also states that Nelson was personally interviewed, was encouraged to remain misconduct free and talk to security, and had no concerns.

134. The signature dates on the September 23, 2020 PRC form are September 28, 2020 for Spyker and October 1, 2020 for Kohler.

135. The September 24, 2020 ICAR entry by Richards records that Nelson declined to sign the PCU acknowledgment, said the program would not benefit him, and was then willing to be released to the general population on BA Unit that day. Richards recorded that she told him notification would be made but that there was no guarantee when he could be moved. The entry concludes that Nelson had no other questions or concerns to discuss that day.

Death CCTV descriptions and the subsequent clinical review

136. On September 25, 2020, Nelson was confined in the RHU without a cellmate when he hanged himself.

137. Shaka Bekoe Nelson died on September 25, 2020 at age 35. The cause of his death was hanging, and the manner of death was suicide.

138. The autopsy report records that Nelson was pronounced dead at 11:29 a.m. on September 25, 2020.

139. The autopsy report describes a neck ligature site, one to one-and-one-half centimeters wide, extending from the right lateral neck to the left lateral neck, and states that the finding is consistent with hanging using a braided sheet.

140. In its written review of September 25, 2020 CCTV footage, the BII report identifies Main RHU B Quad Camera 136 and describes Forshey walking into B Quad at the displayed time 10:50:40, the cell door opening at 10:51:43, and staff entering at 10:51:44.

141. The same Camera 136 written review describes Nelson being brought out of the cell and placed on a gurney at the displayed time 11:01:15 and being wheeled out of camera view at 11:01:49.

142. The clinical Suicide Review is dated September 30, 2020, addresses the September 25, 2020 death, and lists DSFM Kohler and DSCS Spyker among the individuals present for the September 30 review meeting. It identifies Licensed Psychology Manager Mark Peters as its preparer and Superintendent Kauffman as its addressee.

143. The September 30, 2020 Suicide Review states that Peer Support services were unavailable in the RHU/DTU 'at that time' because of COVID-related quarantine and movement restrictions.

Additional responsibilities and statewide reports

144. Kohler testified that his responsibilities as Deputy Superintendent for Facilities Management included security operations, maintenance and the physical plant, and related budget matters. He also described responsibility for incorporating Central Office policies requiring institutional implementation into annually reviewed post orders.

145. The 2014 letter reported that 206 of the 288 documented suicide attempts between January 1, 2012, and May 31, 2013 occurred in solitary-confinement units. Its oversight discussion also stated that DOC did not examine the role of solitary confinement in causing suicides.

146. The Pennsylvania Statewide Suicide Prevention Plan bearing a September 2020 date reports a recent internal DOC review of 13 years of suicides in which approximately 96 percent occurred while the individual was alone in a cell. The same discussion describes a housing committee, monitoring of the number of inmates housed alone at each institution, and changes to housing contraindication criteria; it also describes a 2019 Suicide Risk Assessment tool and expanded suicide-prevention training.

Additional mental health and custody records from 2019

147. Dr. Yueheng Han's initial psychiatric assessment dated June 17, 2019, and signed June 18, 2019, records Nelson's report of prior hanging and wrist-

cutting attempts and thoughts of jumping from a roof. It records guarded behavior, suspiciousness, overvalued ideas and poor insight or judgment, with “None” checked for suicidal, homicidal and hallucinatory findings. Dr. Han stated that the information was insufficient for a clear diagnosis, requested a second opinion, and continued Seroquel pending further evaluation.

148. In a September 13, 2019 psychiatry note, Jessica Cousins recorded a reduction of Seroquel from 500 to 400 milligrams at bedtime pending regional-psychiatrist review of a taper request. Her stated reasons included reported prior misuse and the medication criteria she described. The same encounter records that Nelson denied current suicidal or homicidal thoughts and thoughts of self-injury, and that she observed no clinical signs of mania or paranoia and a logical, goal-directed conversation.

149. Grievance 828013 is dated October 7, 2019 and bears an October 8 acknowledgment. Nelson complained of unwanted touching by cellmates, stated that he felt vulnerable, and requested a Z code and private handling. The October 8 response rejected the grievance as untimely and stated that the sexual-abuse allegations were being forwarded to the Security Office and PREA Compliance Manager.

150. The November 5, 2019 report for D277175 charged Nelson with threatening another person. The November 8 hearing report records a guilty finding on charge 17, thirty days of disciplinary custody effective November 5, and suspension or removal from his job. The November 6 mental-health consultation marks Yes for suicide-attempt history and a current serious-mental-illness diagnosis, and No for contraindications to potential segregation. Plaintiff was sent to the Diversionary Treatment Unit due to his medical diagnosis.

151. The November 6, 2019 DC-516 concerning the hunger strike records Nelson's D stability code, an earlier Bipolar I diagnosis by Dr. Mushtaq, and reports of prior attempts by hanging, cutting, and attempting to jump from a roof. It marks No to the contemporaneous subjective report of suicidal intent or self-injurious behavior and records no suicidal plan. The approval entries for William Walters and Kevin Kauffman are dated November 14, 2019.

152. Cousins's note describes a November 26, 2019 cell-door encounter and was electronically signed November 27. It records Nelson's requests to resume Seroquel and complaints of poor sleep and hearing voices. It also records that he declined an out-of-cell appointment, that an attempted discussion of alternative medication ended after he became agitated, that the mental-status

fields recorded no suicidal or homicidal ideation or hallucinations, and that follow-up would continue.

153. Diehl's December 3, 2019 PRT note states that Nelson refused to attend PRT. It lists Cousins, Diehl, Captain House and LPN Wilkins as reviewing him and records the change from D to C and a planned transition to the RHU. Walters's later grievance response states that the team went to Nelson's cell and discussed the change.

154. Grievance 837866 bears the handwritten date "11.3.19," describes a November 26 conversation, and was acknowledged December 5, 2019. Nelson complained about medication and diagnosis changes and requested Z and D codes. Walters's December 12 response states that he reviewed medical records and spoke with Cousins, describes offered alternatives and medication refusals, and states that the December 3 PRT discussed loss of D status and movement from DTU to RHU housing. The response denied the grievance.

155. The DC-141 Part III form for report D368436 bears a review date of December 5, 2019. It states that Nelson had been placed in observation after reporting thoughts of hurting himself, that PRC reviewed PMHNP Cousins's recommendation for release from POC to AA Block, and that PRC notified the Inmate Employment Office for bed placement on AA Block. The form

marks "Release to GP." It lists Brumbaugh, Walters and Spyker; Spyker's signature is dated December 19 and Brumbaugh's December 20, 2019.

156. The December 5, 2019 "POC Discharge" email printout shows a 1:46 p.m. message from Jessica Cousins, with Joel Kohler and Jill Spyker among its named addressees, requesting Nelson's discharge from POC to AA Block "with no psychiatric restrictions pending PRC approval." It shows a 2:36 p.m. reply from William S. Walters stating, "Approved control notified. Scott Walters."

Additional housing treatment and disciplinary records from 2020

157. The cell-location history lists AA Block general-population placements from December 5, 2019 until the RHU placement beginning June 10, 2020, with brief "UNASSIGNED" transition entries on January 7 and February 5.

158. The January 6, February 6 and March 5, 2020 DC-560 notes document out-of-cell mental-health contacts. The January note records discussion of family and coping and Nelson's request to see psychiatry to discuss medication; the February and March notes record discussion of a relationship, family or music. Each records denial of suicidal and homicidal ideation and a plan to continue contact.

159. The March 18, 2020 D372136 report lists charges 35, 42, 50 and 41 and identifies them as Class I. An informal-resolution form signed by Unit Manager T. Strait on March 25 records seven days' loss of kiosk access, March 25-31, with reinstatement April 1; it records no disciplinary-custody sanction.

160. The June 29, 2020 report for D536832 charged refusal to obey an order to report for TB testing and directed pre-hearing confinement and a temporary Z designation pending medical review. The July 1 hearing report marks Not Guilty and states "Charge #35 - Dismissed." The cell history lists a return to general population on July 1.

161. The July 8, 2020 hearing report for D536822 records a guilty finding on abusive-language charge 33, dismissal of charge 15, and thirty days of disciplinary custody and suspension or removal from Nelson's job effective July 6.

162. The August 31, 2020 Other Report D434893 states that Nelson was issued D572470 after refusing the August 26 order to return to general population; that D572470 was dismissed without prejudice on August 28; and that rewritten report D572409 was dismissed without prejudice on August 31. It requests continued RHU placement pending another rewrite. The September

9 hearing disposition on D572461 imposed 30 days of disciplinary custody effective August 26.

Z code approval and the later clinical review

163. The September 30, 2020 Clinical Review states that Nelson received institutional support for a Z code; the vote sheet was forwarded to Central Office on September 3, 2020; Nelson was informed by his assigned counselor of institutional support; the Z code was approved on September 14, 2020; and SCI Huntingdon was notified on September 15, 2020.

164. Attachment A to the Clinical Review lists DC-560 mental-health contact notes dated July 6, 7, 9, 16 and 24, August 21, and September 9, 2020. The review identifies September 9 as Nelson's last mental-health contact before death and reports 40 total mental-health contacts during its reviewed period, including nine after removal from the mental-health roster. The September 25 DC-516 lists September 9 as the most recent psychology contact and June 23 as the most recent psychiatry contact, placing the latter interval in the "60-180 days" category.

165. The Clinical Review lists among acute suicide risk factors angry or agitated presentation, current Level 5 housing, current Z code or being celled alone, no prescribed psychotropic medication, and no current suicide precautions. The same review states that Nelson consistently denied relevant symptoms

except when seeking a Z code, that its record review found no sudden mental-health change or overt distress sufficient to warrant increased monitoring, and that interpersonal support and relationships with other inmates were protective factors.

Rescue records and the later investigative disposition

166. Responding officers held Nelson up to relieve the pressure of the ligature, and Matthew Kelley cut the noose with his keys. Responding staff did not have a 911 tool, or J-Tool, immediately available. The Staff Response/Action record states that Kelley used his keys because he did not have immediate access to the 911 tool. The BII report records Grassmyer's direction to retrieve the tool and Johnston's account of running to the control bubble, obtaining it and handing it to another officer. The report's description of the handheld footage lists the retrieval order at 10:47:58 and cutting with keys at 10:48:10. Staff performed CPR until medical staff arrived.

167. The EOR attachment list identifies a Suspected Suicide Letter, and the associated Employee Incident Reports packet contains four handwritten pages attributed in the investigation to Nelson.

168. The BII Executive Summary concerning investigation 2020-F-061 is dated April 27, 2021 and addressed to Secretary John Wetzel. The associated

charging document dated April 27, 2021 bears a signature on the Secretary John E. Wetzel line, marks Other, and states No further action. The summary records noncompliance with the directive to carry J-Tools and also concludes that staff responded promptly and provided necessary care and effort.

Telephone report entries and family contact labels

169. The supplied Call Detail Report lists 575 entries from June 20, 2019 through September 23, 2020, of which 547 have positive recorded durations and 28 have zero durations. By matching called numbers to the supplied PAN labels, 56 entries match Christiana Nelson, 43 Fredrick Henry, and 85 Akil Nelson; their positive-duration subsets are 51, 36, and 81 respectively. Entries also match numbers labeled Kamaria Nelson, Tia Nelson, and Kimesha Perkins.

170. The supplied Call Detail Report lists 60 entries in January 2020, 54 in February and 68 in March. All January and March entries have positive recorded durations; 45 February entries have positive durations and nine have zero durations. From August 1 through September 23, 2020, it lists seven entries, each with a recorded duration of 900 seconds.

171. The last entry in the supplied Call Detail Report is dated September 23, 2020, from 6:08:34 p.m. to 6:23:34 p.m., with a recorded duration of 900

seconds. Its called number matches the number labeled Kimesha Perkins, Sister, in the supplied Inmate Managed PAN report.

Entries in the supplied suicide compilation

172. The supplied native suicide compilation contains 88 visible data rows marked Suicide = Yes, with listed Date of Attempt values from February 18, 2014 through January 5, 2021. Of those rows, 84 predate September 25, 2020, one is Nelson's September 25 entry, and three are dated later.

173. Among the 84 entries dated before September 25, 2020, 30 list RHU in the Housing Unit field; 57 list Single or Single Cell (No cellmate assigned) in the Housing Status field; 54 list exactly C or D in Patient Roster Status, and one additional entry lists B-D; 42 mark Yes for prior suicide attempt and/or self-injury; and 79 list Hanging as the method. These categories overlap.

174. Six rows in the supplied compilation identify SCI Huntingdon, including Nelson's row and five with earlier dates. The September 18, 2017 row lists RHU, Single, C roster, and Yes for history of prior suicide attempt and/or self-injury. The other four earlier Huntingdon rows list GP, DTU, GP and RTU.

175. On October 30, 2019, Shaka Nelson was found guilty of misconduct D277106 after the hearing examiner accepted guilty pleas to charges 35 and 41. The hearing disposition imposed concurrent fifteen-day cell-restriction sanctions effective October 30, 2019. The hearing report identifies cell restriction as the sanction but does not by itself identify the unit where that sanction was served. The cell-history record reflects that Nelson was housed in the Residential Treatment Unit (RTU) during the fifteen-day cell-restriction period. The RTU is designed to provide structure, consistency, and support to individuals diagnosed with a serious psychiatric disorder and/or substantial impairment in psychological functioning. The RTU uses treatment strategies based on a Recovery Model intended to facilitate growth, hope, self-determination, coping skills, and therapeutic alliances. This program description does not stipulate that Nelson received any particular amount or type of services during the sanction.

176. On November 8, 2019, Shaka Nelson was found guilty of misconduct D277175 on charge 17. The hearing disposition imposed thirty days of disciplinary custody, effective November 5, 2019, with loss of his job. The hearing report does not by itself establish the unit in which that sanction was served. Nelson’s cell history indicates that he was housed in the Diversionary Treatment Unit (DTU) during his disciplinary-custody period. A November 6, 2019 mental-health consultation recorded suicide-attempt history and a serious-

mental-illness designation. The DTU is a specialized housing unit within a Restricted Housing Unit setting, designed to provide structured mental-health care and behavioral support for prisoners with serious mental illness who have committed Class I disciplinary infractions. The general DTU program description calls for an offer of at least twenty hours of out-of-cell activity per week, including structured therapy, counseling, and programming; it does not establish that Nelson actually received twenty hours of such activity in any particular week.

177. Shaka Nelson was the subject of four identified misconduct proceedings between June 10 and August 26, 2020: D536832, D536822, D487532, and D572461. The particular charges and dispositions are reflected in the individual misconduct records, and the four identified proceedings should not be treated as four sustained findings without reference to those dispositions. A June 23, 2020 psychiatry note recorded a change to B mental-health stability status and removal from the active mental-health roster. The cell-location history records RHU placements and intervening general-population intervals during the relevant period.

Dated: November 3, 2026

Respectfully submitted,

/s/ O. Williams Igbokwe
O. Williams Igbokwe, Esq.
IGBOKWE PLLC
One World Trade Center, 85th Floor
New York, NY 10007
Telephone: (347) 467-4674
Facsimile: (347) 467-6367
Email: will@iwlaws.com
NY Bar No. 5170683 | Admitted pro hac vice

Counsel for Plaintiff